# CHARLESTON.

## KENNEDY *v.* EHLEN. '

Submitted September 6, 1888.—Decided November 24, 1888.

1. REMOVAL OF CAUSES—TIME OF FILING PETITION.

A bill is taken for confessed and regularly set for hearing at the October rules on the 3d day of October. A special term had been called of the Circuit Court to be held at a subsequent day during the month of October. The cause is ready for hearing and trial at such special term, the court being authorized by statute to try such cause. Such a cause can be removed into the Circuit Court of the United States on the petition of a non-resident defendant at this special term, but not at the first regular term of the court in January following, as the petition for such removal must be filed at the term of the court, at which it is first ready for hearing and trial, which was the October special term of the court. (p. 556.)

2. REMOVAL OF CAUSES—CITIZENSHIP OF PARTIES.

If a non-resident defendant, who petitions for the removal of a cause from the State-court into the Circuit Court of the United States, is a citizen of Maryland, and most of the plaintiffs, with whom he has the controversy, are also citizens of Maryland, though some of them are citizens of West Virginia, the State-court ought to refuse to remove such cause; for to justify such removal all the parties forming together a party on one side of a controversy in a cause must be citizens of different States from those forming together the party on the other side of such controversy. (p. 558.)

3. FRAUDS, STATUTE OF—AGREEMENTS RELATING TO LAND—AUTHORITY OF AGENT.

The West Virginia statute of frauds requires the memorandum of the purchase of lands to be in writing and signed by the agent in order to be binding. But it does not require, that the agent should be authorized in writing to sign such contract of purchase, and he may be authorized verbally to make such contract, while by the English statute of frauds the agent must be thereunto lawfully authorized in writing. (p. 558.)

Statement of the case by GREEN, JUDGE:

On March 24, 1883, Elizabeth G. Kennedy and Martha E. Gray of the city of Baltimore, E. Boyd Pendleton and Lucinda, his wife, of West Virginia, Charlotte R. Pendleton and Alexander R. Pendleton of Virginia entered into a

written agreement with one James A. Buchanan of Baltimore, Md., with reference to the sale and purchase of 6,000 acres of land lying partly in Berkeley county and partly in Morgan county, W.. Va. The following is a copy of the agreement:

" This agreement, made and executed to defendants this 24th day of March, in the year eighteen hundred and eighty three, between Elizabeth G. Kennedy and Martha Gray, of the city of Baltimore and State of Maryland, Philip Pendleton and Virginia Pendleton, his wife, E. Boyd Pendleton and Lucinda Pendleton, his wife, of the county of Morgan and State of West Virginia, Charlotte R. Pendleton, widow of the late Edmund Pendleton, deceased, and Alexander R. Pendleton, son and heir at law of the said Edmund Pendleton, deceased, of the county of Frederick and State of Virginia, the parties of the first part, and James A. Buchanan, of the city of Baltimore and State of Maryland aforesaid, of the second part, witnesseth, that the said parties of the first part have covenanted and agreed to sell, and by this agreement do covenant and agree to sell, to the said James A. Buchanan, the party of the second part hereto, the lands lying and being in the counties of Morgan and Berkeley and State of West Virginia, on Third Hill and Sleepy Creek Mountains, and in the valley of the Meadow Branch, belonging to the estate of the late Philip C. Pendleton, late of the then State of Virginia, and the late Edward Gray and John P. Kennedy, both deceased, late of the city of Baltimore and State of Maryland, upon the following terms and conditions: That is to say, that the said party of the second part is fully authorized and empowered to enter upon and take possession of said lands, containing some six thousand acres, more or less, and to occupy them until the first day of July in the year eighteen hundred and eighty three, and at the end of that period, or at any time during the same, to purchase the property aforesaid, at his option, for the price of thirty thousand dollars (30,000,) the purchase-money to be paid, one third cash, and the balance in two equal payments, at one and two years, the credit payments to be secured by bonds, and a deed of trust on said property or otherwise, in a manner satisfactory to all the parties of the first part

hereto, and to draw interest at the rate of six *per cent. per annum* from date until paid ; and it is further understood by and between the parties of the first and second part hereto, that the party of the second part shall have the right to pay and take up the bonds or notes given for the deferred payments at any time, by paying to the parties entitled thereto the principal thereof, together with such interest as shall have accrued thereupon. It is also further understood by and between the parties of the first and second part hereto that the said party of the first part shall not, and they hereby bind themselves not to, sell or lease the said property to any other parties during the aforesaid period between the date of this agreement and the 1st day of July, 1883, or ten days thereafter, without the consent of the party of the second part, unless in the mean time the latter shall have decided not to purchase the property aforesaid, and shall have so notified the parties of the first part ; and it is further understood and agreed by and between the parties of the first and second part hereto that, inasmuch as the option to purchase is based upon the result of explorations to be made by the party of the second part, in order to ascertain the quantity and quality of timber, and the natural and probable extent of mineral deposits upon and in the said property, the said party of the second part binds himself to begin such explorations without unnecessary delay, and to prosecute them with vigor, and to conduct the same for said purpose, and for said purpose only, and to do no unnecessary damage to the said property, or to the timber thereon ; it being thereby further understood and agreed that no large and unnecessary quantities of coal, timber, or other material shall be taken off or removed from said property by the said party of the second part during the continuance of the option hereinbefore reserved to him ; otherwise this agreement shall be void.

" Witness our hands and seals.

"A. R. PENDLETON.     [Seal.]

" CHARLOTTE R. PENDLETON.   [Seal.]

" Teste as to C. R. Pendleton and A. R. Pendleton.

" ―――― ―――― .

" LUCINDA PENDLETON.     [Seal.]

" E. B. PENDLETON.     [Seal.]

"As to Lucinda Pendleton and E. B. Pendleton.

"C. H. PENDLETON.

      "ELIZABETH G. KENNEDY. [Seal.]

      "MARTHA E. GRAY.   [Seal.]

      "JAMES A. BUCHANAN.  [Seal.]

"As to Mrs. Kennedy and Mrs. Gray and James A. Buchanan.

  "JOHN J. DONALDSON."

The option to purchase these 6,000 acres of land on the terms named was exercised by said James A. Buchanan prior to July 1, 1883, and in August, 1886, the parties of the first part, other than Philip Pendleton and Virginia, his wife, who never executed this agreement, instituted this suit in chancery in the Circuit Court of Berkeley county to enforce a specific performance of the contract. They allege, that, when this contract was entered into, Elizabeth G. Kennedy and Martha E. Gray each owned one undivided third of said 6,000 acres described in said agreement, and E. Boyd Pendleton and A. R. Pendleton each owned one undivided ninth part of said parcel of land, and that Philip Pendleton and Virginia, his wife, owned the remaining ninth part of said land, and it now belongs exclusively to Virginia Pendleton and it was uncertain whether Philip Pendleton and Virginia, his wife, would sign this agreement, and the understanding was that this one ninth part of said land was not sold with the eight ninths owned by the complainants, and when James A. Buchanan under this contract elected to become the purchaser of said lands on the terms named in the contract, which he did prior to July 1, 1883, he did so with the full knowledge, that this one ninth was not sold,—he being willing to take the eight ninths owned by the complainants, who had executed the contract on the terms named in the contract.

As the bill alleges, a letter is filed with the bill, showing the exercise of this option. It was written by James A. Buchanan and is dated June 29, 1883, and in it he states: "I am now prepared to take these lands in Berkeley and Morgan counties, W. Va., in accordance with the terms of the option of March 24, 1883, and I am prepared to make the cash payment of $10,000.00 as soon as the lines are es-

tablished, and satisfactory title papers are made by the vendors."

The following allegation is made in this bill : " Your oratrices and orators further show unto your honor that said James A. Buchanan, in entering into said agreement, (though this fact was not definitely known to your oratrices and orators at the time,) was acting for himself, John F. Ehlen, Frank Ehlen, Fred Ehlen, and Charles P. Manning, and others, who were then contemplating the formation of, and who a short time thereafter (viz., in June, 1883,) actually did form themselves into a joint stock company or corporation known as the ' Meadow Branch Anthracite Coal & Iron Company of Baltimore City.' A certified copy of the official record in the superior court of Baltimore city, of the incorporation of the said company, is herewith filed, marked ' Exhibit B.' "

Exhibit B referred to is simply a duly certified copy of a written agreement, signed and sealed by James A. Buchanan and John F. Ehlen, Fred Ehlen and Charles P. Manning, whereby under the general laws of Maryland they formed a corporation under the name of the " Meadow Branch Coal & Iron Company of Baltimore City." This corporation, the agreement stated, was formed for the purpose of mining coal and iron ore and selling lumber, coal and iron ore and preparing the same for market. The aggregate stock of the company was to be three millions of dollars, in shares of $25.00 each, and that said five persons signing this agreement were to manage the affairs of the corporation the first year. This agreement was dated June 27, 1883.

The bill also alleges, that the surveys, boundaries and conditions of title referred to in this letter were all made within a month or two, after said letter was written, and were entirely satisfactory; that the complainant spent some $500.00 in making these surveys and this complete and satisfactory abstract of their title to said lands; that " pursuant to this agreement James A. Buchanan, the Meadow Branch Anthracite Coal & Iron Company, and said parties, for whom he was acting, did at once under this agreement enter upon and take possession of said lands and have ever since had the possession of the same, asserting their ownership of

them; that they have cut and removed from said land large quantities of lumber and bark, and the cutting thereof is still going on, and that nothing has ever been paid the complainants on the purchase of said lands, and that Thomas Deford and B. F. Deford have now in their possession a large quantity of bark from said land, which has not been paid for by them."

The bill further alleges, that "James A. Buchanan was merely one of the parties, who afterwards became the incorporators of said Meadow Branch Anthracite Coal & Iron Company, and he was the agent of the others in entering into the agreement hereinbefore recited, and each of said corporators in his individual capacity, and said company in its corporate capacity, having adopted and ratified James A. Buchanan's contracts, acts and acceptance aforesaid are bound for the debt to your complainant, as evidenced by said agreement;" that little mining has been done by said company on said lands; that this corporation and all of its said corporators are non-residents of West Virginia; that said Defords are also non-residents of West Virginia but have in this State a tannery, which is superintended by one S. W. North, a resident of this State, who holds the money to be paid for said bark, some $300.00 in amount; that but for this agreement the complainants could have repeatedly sold said lands to others for $30,000.00 or for more in cash or its equivalent, but they have been prevented from so doing by the possession of the lands by the defendants and their claim of the ownership of them; that the plaintiffs had frequently tendered a deed for these lands in accordance with this agrement and were now ready to deliver it, whenever the contract should be complied with by defendants, who the bill alleges are all insolvent; and they made *profert* of this deed duly executed and acknowledged for recordation and filed the same with the bill.

The prayer of the bill was, that the Meadow Branch Anthracite Coal & Iron Company of Baltimore City, all the incorporators of said company, the superintendent of said company, the members of the firm of Deford & Co., P. Pendleton and Virginia Pendleton be made defendants; that said Buchanan may discover on oath all the corporators of

said company and the extent of their interest, and for whom he acted in the premises; that they discover the amount of bark and lumber, which they have taken from said lands; that the Meadow Branch Anthracite Coal & Iron Company be enjoined from cutting and taking away any timber or bark for removal from said lands; that Deford & Co. be restrained from paying for any bark so taken from said lands except under the order of the Court, and that the said bark be charged with a trust from the plaintiffs' claim; that said agreement be continued, and the plaintiffs' rights and reme-- dies be established and proper relief granted them; that if the said agreement does not establish an absolute sale to said incorporation and company, $3,000.00 be awarded the plaintiffs, which is alleged to be the amount received by said corporation, *etc.*, for bark, lumber and minerals taken from said land; and that $5,000.00 be awarded the plaintiffs as damages for the loss of the sales of said land to other parties through the false claim to said lands by the defend- ants. If said agreement does establish a sale, the plaintiffs pray, that the specific performance of said agreement may be decreed; and that the funds in Deford & Co.'s hands or in the hands of their agent, S. W. North, may be attached and paid to the plaintiffs on their damages aforesaid or on their debt, as the case may be; and that the sheriff of Berke- ley county as special receiver shall be directed to seize all bark and timber on said lands or elsewhere, taken from said land by said company, and that the same be sold and the proceeds applied on the payment of the plaintiffs' claims; and it concludes with a prayer for general relief. The bill was sworn to by A. R. Pendleton.

On November 10, 1886, the following decree was entered in said cause : "November 10, 1886. Elizabeth G. Kennedy, *etc.*, *vs.* the Meadow Branch Anthracite Coal & Iron Co. This day came the defendant, S. W. North, and demurred to plaintiff's bill, and plaintiff joined in said demurrer, and, after hearing arguments of counsel thereupon, and having maturely considered the record in this case, the court being of opinion that the allegations of the bill are sufficient in law, it is adjudged, ordered, and decreed that the said defend-

ant's demurrer be overruled ; and, on motion of said defend-
ant North, by his attorneys, leave is given him to file his
answer within twenty days from the adjournment of the
present term of this court."

At the next term of said court, in January, 1887, the de-
fendants, The Meadow Branch Anthracite Coal & Iron Com-
pany of Baltimore City, James A. Buchanan, John F. Ehlen,
G. Berkebiles, Frank Ehlen and Fred Ehlen, filed a petition
as non-residents of West Virginia, in which it is alleged, that
the plaintiffs are residents of West Virginia and ask, that
the said cause be removed into the Circuit Court of the
United States, Fourth Circuit, District of West Virginia; and
there was filed with this petition the bond with good secu-
rity required by the act of Congress of 1875. The bill was
filed at September rules, 1886, and a decree *nisi* against all
the home-defendants, upon all of whom the summons had
been served, and an order of publication entered against the
non-resident defendants. At the October rules, 1886, the
bill was taken for confessed as to all the defendants served
with process, and the order of publication entered as com-
pleted against all the non-residents defendants, and the
cause set for hearing. At the October term of said court,
the Circuit Court of Berkeley proceeded no further in the
premises, so far as these petitioners were concerned.

This petition was filed under the act of Congress of March
3, 1875, and they tendered with it the bond required on such
removal by the act of Congress of 1875 in such cause, with
good security. On February 1, 1887, the court entered a
decree refusing to remove said cause and dismissing said
petition. The grounds, on which the court based this decree,
are set out in the decree of February 1, 1887, which is as
follows:

" This cause came on further to be heard this 1st day of
February, 1887, on the papers formerly read, the process
duly completed as to all the home defendants, and the order
of publication duly completed as to the non-resident de-
fendants prior to the October term, 1886, of this court, and
the cause set for hearing as to all the defendants at said
October term, 1886, and upon the petition marked by the
clerk as filed January 8, 1887, and filed at this term of court

by the Meadow Branch Anthracite Coal & Iron Company of Baltimore City, Md., James A. Buchanan, John F. Ehlen, G. Berkebiles, Frank Ehlen and Fred Ehlen, for the removal of this cause, under the act of Congress of March, 1875, to the Circuit Court of the United States, Fourth Circuit, District of West Virginia, verified by affidavit, and made January 8, 1887, accompanied by the bond of John F. Ehlen and Henry St. John Shepherd, in the penalty of three hundred dollars, dated January 8, 1887, conditioned for the entering by said petitioners in said United States Circuit Court of a copy of the record of said suit, *etc.;* and upon the affidavits of A. R. Pendleton, E. B. Pendleton, Ed. Pendleton, and C. H. Pendleton, filed this day in open court, by leave of the court, setting forth the residence of complainants; and was argued by counsel. On consideration whereof the court, being of opinion that this cause was matured for hearing under the laws of this State, as to all the defendants, at the October term, 1886, and that, therefore, said petition for removal, which hath first been presented at this term, hath not been filed at the first term the cause stood for hearing; and, further, being of opinion that at the October term, 1886, one of the defendants to the cause filed a demurrer to the bill, which at that term was overruled, and that after the action on said demurrer of one of said defendants, going to the merits, whereby it is shown that said cause was matured for hearing at said October term, it is too late to file said petition to remove under said act of Congress; and, further, that the bill stands confessed by all of said defendants petitioning for said removal, and upon default entered, and that said default hath not been set aside, and that there hath been no appearance by demurrer, plea, or answer by the said defendants petitioning for said removal, and that for that reason this cause could not be removed; and also further being of opinion that all the parties petitioning for said removal are residents and citizens of Maryland, except James A. Buchanan, resident of New York, and that Elizabeth G. Kennedy and Martha E. Gray, two of the complainants, are, and continuously since and at the institution of this suit were and are, residents and citizens of Maryland, E. Boyd Pendleton, of West Virginia, and A. R. Pendleton,

of Virginia, and that therefore the said act of 1875 would not entitle said petitioners to remove said cause to said U. S. Court,—doth now adjudge, order, and decree that said petition for removal, and said removal, are rejected, refused and denied, and that said petition be, and the same is hereby, dismissed, and that the complainants recover from said petitioners their costs upon said petition; and thereupon and after said ruling of the court above set forth the said Meadow Branch Anthracite Coal & Iron Company of Baltimore City, Md., James A. Buchanan, John F. Ehlen, G. Berkebiles, Frank Ehlen, and Fred Ehlen demurrer to said bill, and the complainants joined in said demurrer; and upon consideration thereof the court is of opinion and doth overrule said demurrer; and thereupon said parties so demurring ask leave of the court to answer said bill within twenty days, which leave is now accordingly granted to them."

The affidavits referred to in said decree are to the effect that the averment in said petition, that the plaintiffs are citizens and residents of West Virginia, is untrue; and that at the institution of this suit the plaintiffs were and continuously since have been residents in sundry States, as follows: Elizabeth G. Kennedy and Martha E. Gray were and are residents of Maryland, E. B. Pendleton is and was a citizen of West Virginia, and A. R. Pendleton is and was a resident of Virginia.

On February 1, 1887, a joint and several answer was filed by The Meadow Branch Anthracite Coal & Iron Company of Baltimore City, Md., James A. Buchanan, Frank Ehlen, John F. Ehlen, Fred Ehlen and G. Berkebiles, the superintendent of said company. In this answer James A. Buchanan admits the execution by him of the agreement of March 24, 1883; that by it he was authorized to take possession of the lands named in it,—some 6,000 acres, more or less, and to occupy them till July 1, 1883; and that at the end of the period or at any time during the same he was authorized to purchase said land at his option for $30,000.00, one third in cash, and the balance in two equal annual payments in one and two years, with interest from date, the same to be secured by bond and a deed of trust on the land, or in some other satisfactory manner. He further said that it is

not true, as in said bill averred, that in entering into said agreement he was acting for himself, John F. Ehlen, Frank Ehlen, Fred Ehlen, Charles P. Manning and others, who were then contemplating the formation of, and who a short time thereafter (viz., in June, 1883,) did form themselves into a joint stock company or corporation, known as the "Meadow Branch Anthracite Coal & Iron Company of Baltimore City." On the contrary he avers, that neither the said Frank Ehlen, Fred Ehlen, Charles P. Manning nor the Meadow Branch Anthracite Coal & Iron Company of Baltimore City, have now or ever had any interest in said agreement or in the lands referred to in the same. He further says, that, at the time said agreement was entered into, no one had any interest in the same except himself, the said John F. Ehlen, and Alexander W. Boteler of Jefferson county in the State of West Virginia. He further alleges, that the plaintiffs could not make good title to the said lands and made no effort to put themselves in a position to do so; that, if they had done so in a reasonable time, he would have had no difficulty in complying with his agreement, but owing to the plaintiffs not being in a position to make a good title to these lands he was unable to procure the money necessary to complete his purchase; and this state of things continued until May, 1884, when by the failure of Grant & Ward in New York city a panic was produced, which rendered it difficult to procure money on any security; and therefore, he alleges, " the execution of said agreement was rendered impossible solely by the default and delay of the plaintiffs and was not in any way attributable to him or those, in whose behalf he entered into the agreement. John F. Ehlen on his behalf reiterated these facts. They also state, that in order to procure the execution of this agreement by James A. Buchanan the plaintiffs represented said lands to be heavily timbered and rich in minerals, and that the timber alone was worth in value the whole of the purchase-money; and relying upon these representations James A. Buchanan signed said agreement. These representations were to a large extent wholly unfounded, but nevertheless John F. Ehlen gave his personal skill and labor in seeking for coal on said lands and spent large sums of money in so doing, for which the plaintiff

ought to compensate him. They admit, that they are non-residents of West Virginia, but deny, that they are insolvent, and assert, that they are engaged in active business and have been able to meet all their business engagements. They say, that they have no knowledge of the amount of bark taken from the land. They deny, that the plaintiffs have ever been offered $30,000.00 for the lands by others, to whom they could not sell because the defendants claimed the ownership of these lands. On the contrary the value of these lands has been greatly enhanced by the investigations and expenditures of John F. Ehlen upon them, for which he should be compensated. Charles P. Manning, a defendant, was a resident of New York, they say, and has since died.

The other defendants answer as follows: " (2) The said Frank Ehlen, Fred Ehlen and the Meadow Branch Anthracite Coal & Iron Company of Baltimore City, separately answering, say that they have not now, and never had, any interest whatever in the matters averred in the bill of complainants, and ask that they may be dismissed as parties defendant in said cause; and the said G. Berkebiles, answering for himself, says that he has no knowledge of the agreement set up in the bill of complainants. He admits that some bark has been taken from said lands, though how much and what value he cannot say. He says, however, that he has been informed, believes and therefore avers, that no part of said bark, or its proceeds, has ever come into the hands, either of himself or any of his co-defendants, except the defendant, S. W. North." These answers were replied to generally.

The facts proven by the depositions are, that Alexander W. Boteler, some ten years before this agreement was made, got a specimen of coal from these Meadow Branch lands, and submitted it to some friends in Philadelphia; it was examined and pronounced anthracite coal of good quality, and some of the parties became so interested in the finding of anthracite coal south of the Potomac, that at their request Mr. Boteler went with them to see these lands. One of them was so pleased, that he said, he would buy them and form a company to mine the coal. Thomas Scott, Judge Lesenring, and others, accordingly, in 1873, agreed to purchase these lands for $30,000.00, if after an examination they concluded

there was coal on them sufficient to justify the mining. The examination was made and was satisfactory. But they did not complete the purchase, because of the financial panic produced by the disastrous failure of Jay Cooke.

James A. Buchanan became acquainted with these facts, and in 1883 he called on John F. Ehlen, who was a man of considerable wealth, a dealer in coal and an iron expert, and proposed to him to obtain an option to purchase these lands for $30,000.00; one third, or $10,000.00, to be paid in cash, if they concluded to buy the land. This $10,000.00 was to be paid by John F. Ehlen, and Boteler was to be employed to get the agreement signed by the owners of these lands and was to be given an interest in the matter contingent upon its turning out to be a success. No representations of any sort as to the coal or lumber on these lands were made by the vendors, who in fact knew less about the lands than the purchasers; and the agreement filed with the bill was executed by the plaintiff, James A. Buchanan. B. Pendleton and wife, who owned one ninth, refused to execute this agreement. But Buchanan and John F. Ehlen were willing to take the eight ninths owned by the plaintiffs on the terms of this agreement. Before the 1st of July, 1883, on an examination made by John F. Ehlen, he and Buchanan concluded to purchase the land, and Buchanan notified the vendors, that he had exercised the option to take the lands. John F. Ehlen was able to make the cash-payment of $10,000.00 on these lands and wanted to do so then, because he wanted the title of the plaintiffs to them investigated, and the lands surveyed. They were surveyed and found to exceed 6,000 acres in quantity, and the title was found to be satisfactory; but the coal on the land did not turn out to be as valuable, as he supposed; and because of this and of stringency in the money market he did not complete the purchase.

At the time he and Buchanan concluded to purchase this land and notified the plaintiff thereof on June 29, 1883, they also concluded that they would procure the incorporation of a company to work the coal on said lands. This was at once done by the signing of the agreement for the incorporation of the company under the laws of Maryland and having the same recorded. The incorporators were James A. Buchanan,

John F. Ehlen, his two sons and Charles P. Manning, who died before this suit was brought. These sons of John F. Ehlen were engaged in business in Baltimore and are and were solvent. Their purpose was, that Buchanan should complete his purchase, the funds to be furnished by John F. Ehlen, and after the deed was made to Buchanan, the lands should be conveyed to said company, which in the mean time should be organized, and stock of it sold to other persons. But this plan was never carried out; the lands were never conveyed to Buchanan nor purchased of him by this company, which was in fact never organized, no stock having ever been sold. In the mean time Ehlen took possession of these lands and put on them a superintendent, Godfrey Berkebiles. The investigation as to the coal in these lands was continued, and some $500.00 in money and labor spent by John F. Ehlen. The superintendent sold a quantity of bark and timber from the land, and there is in the hands of North, a resident of Morgan and an agent of the purchasers, some $300.00 of money still due for this bark.

On October 18, 1887, the Circuit Court entered the following decree: "This cause came on further to be heard this 19th day of October, 1887, on the papers formerly read, the answer of James A. Buchanan, John F. Ehlen, Frank Ehlen, Fred Ehlen, G. Berkebiles, and the Meadow Branch Anthracite Coal & Iron Company, the general replication thereto, and the depositions and exhibits filed on behalf of complainants and defendants, and was argued by counsel; on consideration whereof the Court doth adjudge, order, and decree that the complainants are entitled to a specific enforcement of the contract set forth in their bill for the purchase of the eight ninths of the real estate therein referred to, for the sum of twenty-six thousand six hundred and sixty-six 66⅔-100 dollars, with interest thereupon from the 1st day of July 1883, until paid, payable to the complainants severally in the proportions set forth in said bill, viz.: To Elizabeth G. Kennedy and Martha E. Gray, each three eighth part thereof; to E. Boyd Pendleton and A. R. Pendleton, each one eighth part thereof,—which said sums, and the costs of this, are due and payable to them by the defendants, the Meadow Branch Anthracite Coal & Iron Company, John F.

70

Ehlen, James A. Buchanan, Frank Ehlen and Fred Ehlen, jointly and severally, and which said sums and said costs are chargeable as a paramount lien on said eight ninths of said lands so contracted to be sold, unless the defendants, or some of them, shall within 45 days from the rising of this court pay to the parties entitled the said sum and said costs. Then it shall be the duty of John J. Donaldson, Willian M. Atkinson, and J. S. Duckwell, who are hereby appointed special commissioners, either one of whom may act, to offer for sale said eight ninths of said lands, publicly, before the Court House in Martinsburg, W. Va., after advertising the time, place and terms of sale for four successive weeks in a Morgan county, a Martinsburg, and a Baltimore weekly newspaper, on terms of one third cash on day of sale, and the balance at two equal payments at one and two years, with interest from the day of sale, the deferred payments to be evidenced by the bonds of the purchaser, and secured by a deed of trust on the property sold ; said sale being made at the risk and cost of said John F. Ehlen, James A. Buchanan, Frank Ehlen, Fred Ehlen, and the Meadow Branch Anthracite Coal & Iron Company of Baltimore City, who shall be liable for the deficiency, if any, jointly and severally. But before acting under this decree the said special commissioners, or the one acting, shall execute bond before the clerk of this court, with approved security, in the penalty of twenty-five thousand dollars, and conditioned according to law. Should said payment be fully made within the above-prescribed period, then the deed for the property, filed with the papers of the cause, shall be withdrawn by said special commissioners, and delivered to said defendants, upon acknowledgment thereof by the living parties thereto; the Court now holding that, by reason of the death of Charlotte R. Pendleton, all her interests have vested in A. R. Pendleton, her sole heir and distributee, whose acknowledgment alone shall be sufficient to pass that interest. The court reserves action on any other of the prayers and claims for relief set forth in the bill of complaints for the present, or for resort against Charles P. Manning's estate."

From this decree and that of February 1, 1887, John F. Ehlen, Fred Ehlen, James A. Buchanan and the Meadow

Branch Anthracite Coal & Iron Company have obtained an appeal.

*Henry C. Kennard* for appellants.

*A. R. Pendleton* for appellees.

GREEN, JUDGE:

The first question presented by this record is : Did the court err in its decree of February 1, 1887, refusing to remove the cause to the Circuit Court of the United States, as asked by the petition of John F. Ehlen and others? The decree on its face shows, that the court below based this decree on these reasons: *first*, that this cause was matured for hearing and regularly set for hearing under the laws of this State as to all the defendants at the October term, 1886, and therefore the petition for removal, which was first presented at the January term, 1887, was not filed at the first term, when this cause stood for hearing ; *secondly*, that as at the October term, 1886, one of the defendants to this cause filed a demurrer to the bill, which at that term was overruled by the decree of November 10, 1886, and after this action, the court going to the merits of the cause, it was too late to file said petition for removal under the act of Congress of March, 1875 ; *thirdly*, that the bill stood for confessed by all the defendants petitioning for the said removal upon default entered, whether rightly or not is immaterial, and said default had not been set aside, and no appearance made by any of the said defendants, the petitioners, by demurrer, plea, or answer, and for that reason could not be removed ; and *lastly*, that all said parties petitioning for such removal are residents and citizens of Maryland except James A. Buchanan, resident and citizen of New York ; and Elizabeth G. Kennedy and Martha E. Gray, two of the plaintiffs, are and at the institution of this suit were and continuously since have been residents and citizens of Maryland, E. Boyd Pendleton, of West Virginia, and A. R. Pendleton, of Virginia, and therefore that the said act of 1875 would not entitle the petitioners to remove said cause to said United States Court. Is it true, as stated in this decree, that this cause was matured for hearing at the October term, 1886 ? The appel-

lant's counsel claim in their argument, that this was a special term of the court, and that the first regular term of the court after the cause was matured for hearing was the January term, 1887, when the petition for removal of the cause to the United States Circuit Court was filed. The appellee's counsel claim, that the October term was a regular term of the court. The record does not show, whether this October term was a regular or special term of the court; but it is obvious, that it was a special term; for the regular terms of the Circuit Court of Berkeley were held in the months of January, April and September, beginning on the second Tuesday in these months, (see Code W. Va., 2d ed., 1027,) and there are but three regular terms of each Circuit Court.

A cause cannot be removed to a Circuit Court of the United States, because it involves a controversy between residents of the State, wherein the controversy is pending, and non-residents of such State, unless the petition for such removal is filed at the term of the court, at which it is first ready for hearing and trial and before the trial. See *Gregory* v. *Hartley*, 113 U. S. 746, 5 Sup. Ct. Rep. 743; *Babbitt* v. *Clark*, 103 U. S. 606; *Alley* v. *Nott*, 111 U. S. 472, 4 Sup. Ct. Rep. 495; *Scharff* v. *Levy*, 112 U. S. 711, 5 Sup. Ct. Rep. 360.

The act of Congress of March, 1875, under which this petition for a removal of the cause was filed, provides, that it may be filed "before or at the term, at which a trial could be had," which in this case would mean before or at the term held in October, 1886, and this whether it was a regular or special term; for by our statute-law any cause ready for hearing may be heard and determined at such special term of a Circuit Court, the same as if it were a regular term of such court. See Code W. Va., ch. 112, § 8, p. 747. The record shows, that the cause was matured for hearing and set for hearing at the October rules, 1886,—that is, on the Monday after the 3d day of October, 1886. And the court below, therefore was not mistaken in reciting in the decree, that the case was matured for hearing at the October rules, 1886, though this was a special term.

It is settled that a cause can not be removed into the Circuit Court of the United States after the term, at which it is

ready for hearing in the State court. It is claimed by the appellant's counsel, that the act of Congress, which authorized the filing of said petition "before or at the term, at which a trial could be had," meant at the first regular term, at which the cause could be first tried, and before the trial thereof; that to construe the statute as applicable in such case would be to leave the whole matter absolutely to the discretion of the lower court ; that by the language, "could be first tried," the statute meant in the regular course of proceedings in the court where this suit is brought. Such a construction, especially where non-residents are employed as counsel, it is claimed, is a practical denial of the right to remove. To my mind the statute must be construed in the same manner, whether the counsel employed were non-residents or residents of this State or of another State. If a non-resident counsel undertakes to practice in the courts of this State, he must be prepared to acquiesce in the decisions of our courts. Our courts do not carry out our law in one manner, when the counsel of parties are residents, and in another manner, when the counsel are non-residents. The cause having been regularly set for hearing at the October rules, 1886, it could only have been moved into the Circuit Court of the United States during the October term, 1886. The position taken by the court below in its decree of February 1, 1887, that the cause ought not to be removed from the State court on the petition of any of the defendants, when the bill stands confessed by all the defendants petitioning for such removal upon default entered at a former term of the court, when said default had not been set aside, and there is no appearance by demurrer, plea, or answer of the defendants petitioning for said removal, appears to be in accord with sound reasoning and is supported by authorities. See *McCallon* v. *Waterman*, (E. D. Mich., Brown, J.,) 4 Cent. Law J. 413; *Bright* v. *Railroad Co.*, 1 Ab. New Cas. 14; Dill. Rem. Causes, 82 ; Desty Removal, p. 148, § 11*d*.

" The term at which a cause could be first tried " means " the term at which either party may demand a trial." It is not necessary, that it should be at the first term at which it could be put at issue, but at any term, before the pleadings are completed, or at the first term following. See *Babbitt* v.

*Clark*, 103 U. S. 606; *Whitehouse* v. *Insurance Co.*, 2 Fed. Rep. 498. When a case, as in the case before us, has been regularly set for hearing and was in a condition, where it could be tried in conformity with law and the practice of the court at a certain term of the court, an application to remove it at a subsequent term comes too late. See *Wanner* v. *Sisson*, 28 N. J. Eq. 117; *Aldrich* v. *Crouch*, 10 Fed. Rep. 305.

The petition for removal was by John F. Ehlen, a citizen and resident of Baltimore, Md., James A. Buchanan, of New York, and The Meadow Branch Anthracite Coal & Iron Company of Baltimore, Md. These several parties defendant have a controversy with the plaintiffs, who were residents of the States of Virginia, Maryland and New York, the petitioners being also residents of these States. Most of the petitioners for the removal of the cause were residents and citizens of Maryland, and most of the plaintiffs, with whom they had the controversy, were also residents and citizens of Maryland. All forming together a party on one side of such suit must be citizens of different States from all those forming together the party on the other side. See *Case of Sewing-Machine Cos.*, 18 Wall. 583; *Hyde* v. *Ruble*, 104 U. S. 407; *Winchester* v. *Loud*, 108 U. S. 130, 2 Sup. Ct. Rep. 311; *Railroad Co.* v. *Mills*, 111 U. S. 249, 5 Sup. Ct Rep. 456; *Crump* v. *Thurber*, 115 U. S. 56, 61, 5 Sup. Ct. Rep. 1154; *Barney* v. *Latham*, 103 U. S. 205. The Circuit Court of Berkeley, therefore, did not err in refusing to remove the cause into the District Court of the United States.

The West Virginia statute of frauds requires the memorandum of the purchase of realty in writing to be signed by the agent to bind. But the agent may have had verbal authority : The English statute, on the contrary, provides that " the agent shall be thereunto lawfully authorized in writing." This was designedly omitted from our statute. See *Conaway* v. *Sweeney*, 24 W. Va. 643; *Brown* v. *Brown*, 77 Va. 619; *Yerby* v. *Grigsby*, 9 Leigh 387; *Johnson* v. *Somers*, 1 Humph. 268; *Doughaday* v. *Crowell*, 11 N. J. Eq. 201; *Shamburger* v. *Kennedy*, 1 Dev. 1.

The Circuit Court properly overruled the demurrer to the bill. The memorandum setting out the terms of such sale was in writing, signed by the party to be charged with the

purchase, and this is all that was requisite to make the contract enforceable. In the cause before us the purchasers are alleged to have ratified the purchase and taken possession of the lands and used them as theirs cutting timber from them. Such part performance made the contract enforceable specifically by a court of equity. 2 Minor Inst. 771 *et seq ; Middleton* v. *Selby*, 19 W. Va. 168; *Conaway* v. *Sweeny*, 24 W. Va. 643; *McComas* v. *Easly*, 21 Gratt. 28; *Lester* v. *Lester*, 28 Gratt. 737 *et seq. ; Brown* v. *Brown*, 77 Va. 619.

The court then properly refused to remove the cause into the Circuit Court of the United States and properly rejected the petition therefor by the decree of February 1, 1887; and, as it is apparent, that the agreement of March 24, 1883, gave to James A. Buchanan an option to purchase before July 12, 1883, on certain specified terms certain lands lying in Berkeley and Morgan counties, W. Va., and that he exercised this option and agreed to become the purchaser on the specified terms before the 1st of July, 1883, and thereafter this became an absolute agreement to purchase said lands on said terms, the court did not err in the decree of October 19, 1887, in decreeing a specific execution of this contract by ordering a sale of said lands to pay the purchase money, unless the same should be paid in a reasonable time fixed by the court.

But the court did err in this decree in deciding, that said purchase-money was due and payable by the Meadow Branch Anthracite Coal and Iron Company, John F. Ehlen, James A. Buchanan, Frank Ehlen, and Frederick Ehlen, jointly and severally; the evidence clearly showing that the said purchase was made by James A. Buchanan for himself and John F. Ehlen, and that Frederick Ehlen and Frank Ehlen had no interest in said purchase. It is true, that, when said purchase was made, there was an understanding between John F. Ehlen and James A. Buchanan, that a corporation would be formed for the purpose of mining coal and iron ore and selling lumber *etc.* from the lands to be purchased ; and that when said option to purchase these lands was exercised, the company was already formed by the agreement of date June 27, 1883, which was signed and sealed by James

A. Buchanan, John F. Ehlen, Frank Ehlen and Frederick Ehlen, as also by one Charles P. Manning, who afterwards died. These articles of agreement being duly recorded, the Meadow Branch Anthracite Coal and Iron Company of Baltimore City at once became a corporation, though there was never any meeting of the stockholders of said corporation and no election of officers, as the business of this corporation so formed by this agreement was for the first year to be conducted by the parties signing the agreement. See *Haws* v. *Petroleum Co.*, 101 Mass. 385.

It was the purpose of James A. Buchanan and John F. Ehlen, when they agreed to purchase said lands, to sell them to this corporation when formed, but there was never any sale of said lands made by them to the said corporation. This was never done, and it does not in any way appear that the corporation was ever willing to give $30,000.00 for these lands, much less that they ever agreed so to do. It was therefore not bound to pay this purchase-money, and much less were Frank Ehlen and Frederick Ehlen bound personally to pay this purchase-money; they being in no manner interested in the matter and only connected with it by having signed the agreement to form the corporation for the purpose of mining *etc.*, but which, when formed, could have mined any other lands it chose to purchase, and was under no obligation to purchase or mine these lands so bought by James A. Buchanan.

The Circuit Court therefore erred in said decree of October 14, 1887, in holding, that the Meadow Branch Anthracite Coal & Iron Company, Frank Ehlen and Frederick Ehlen were jointly and severally bound with John F. Ehlen and James A. Buchanan for the sum of $26,666.66⅔, with interest from July 1, 1883, till paid, the balance of the purchase-money for eight ninths of said lands, the only parties personally bound for the said purchase-money being James A. Buchanan and John F. Ehlen. This decree was in all other respects correct.

The counsel for the appellees insist, that the decree should in this respect be corrected and then affirmed without costs against the appellees. It is true, that in certain cases this Court as well as the Court of Appeals of Virginia does cor-

rect and affirm decrees of the courts below. See *Conner* v. *Fleshman*, 4 W. Va. 693; *Pumphry* v. *Brown*, 5 W. Va. 110; *Price* v. *Thrash*, 30 Gratt. 530; *Horton* v. *Bond*, 28 Gratt. 815.

But cases when this has been done are very different from the case before us. Here the court below has erroneously adjudged that two of the appellees are personally bound for a sum exceeding $25,000.00, and it is strenuously insisted by the appellees' counsel that the court committed no error in so deciding. The only manner, in which the appellees could have this error corrected, was by appeal from the decree. This they have done, and they are entitled in justice to have it reversed and to recover their costs incurred in the appellate court.

The decree of the Circuit Court of February 1, 1887, refusing to remove the cause to the Circuit Court of the United States must be affirmed; but the decree of October 19, 1887, must be reversed, and the appellants must recover of the appellees their costs; and this cause must be remanded to the Circuit Court of Berkeley, to be there proceeded with according to the principles laid down in this opinion and further according to the principles governing courts of equity.

REVERSED. REMANDED.