## McCULLOUGH et al. v. SUTHERLAND et al.

(Circuit Court, N. D. West Virginia. April 16, 1907.)

1. SPECIFIC PERFORMANCE—PARTIES—CORPORATIONS.

Where the owners of all the stock in a corporation agreed to convey the same to defendants and to execute a deed to the corporation's property, the corporation as such was not a necessary party plaintiff to a suit to enforce specific performance.

2. CORPORATIONS—TRANSFER OF STOCK—EFFECT.

Where the owners of all the stock of a coal corporation agreed to transfer the same to defendants and to execute a deed of the corporation's real estate, the transfer of the stock, franchises, and rights of the company unincumbered operated as a transfer of the real estate as effectively as the execution and delivery of a deed.

3. FRAUDS, STATUTE OF—MEMORANDUM—SIGNATURE BY AGENT.

Where a contract for the purchase of land is signed by the purchaser's duly authorized agent in his own name as agent, such contract constitutes a sufficient memorandum in writing to satisfy the statute of frauds.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 23, Frauds, Statute of, §§ 251–260.]

4. SAME—PART PERFORMANCE.

Where defendants agreed, as part of the same transaction, to purchase a railroad and coal mining corporation, and they did in fact purchase and take over the railroad, such act constituted a sufficient part performance to satisfy the statute of frauds.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 23, Frauds, Statute of, §§ 287–292.]

**5. SPECIFIC PERFORMANCE—SALE OF LAND—PAROL CONTRACT.**

A court of equity, in order to defeat fraud, will compel specific performance of a parol contract for the sale of land, if established by clear and convincing proof.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 44, Specific Performance, §§ 113–119.]

**6. SAME—PARTIES—LIENORS.**

Where, at the time of a contract for the sale of all of the stock, assets, etc., of a corporation, there existed to the knowledge of all the parties a mortgage on the corporation's property to a trustee to secure certain outstanding bonds, which the vendors agreed either to pay prior to conveyance or to suffer an abatement of the price equal to the amount due on the bonds on the day the conveyance was made, the trustee was not a necessary party to a suit to enforce specific performance.

**7. SAME—ELECTION.**

Where a contract for the sale of all a corporation's stock, franchises, and property provided that the vendors should satisfy certain outstanding bonds or suffer an abatement of the price equal to the amount due thereon at the time of the transfer, and the vendees thereafter repudiated their obligation to complete the contract, the vendors in a suit to enforce specific performance were entitled to elect whether they would pay the bonds or suffer an abatement of the price.

**8. SAME—MUTUALITY OF REMEDY.**

Where complainants, who owned all the stock in a coal-mining corporation, the property of which was subject to a mortgage to secure certain outstanding bonds, contracted to sell the same in connection with the railroad company to defendants for a specified price, there was no want of mutuality of remedy, precluding complainants from maintaining a suit for specific performance.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 44, Specific Performance, §§ 9–11.]

**9. SAME—EVIDENCE.**

Complainants, who were the owners of two corporations, one operating a railroad and the other certain coal fields, refused to sell the railroad to defendants without the coal fields, whereupon separate contracts were executed for the sale of both as a part of the same transaction; complainants being assured that both properties would go together. Defendants took over the railroad, but refused to complete the contract as to the coal fields for various technical reasons, which were subsequently obviated, when they refused absolutely to comply with such part of the contract. *Held*, that the contract was single and indivisible, and that complainants were entitled to enforce specific performance of the part relating to the coal fields.

[Ed. Note.—Persons entitled to enforce specific performance, see note to Lawyer v. Post, 47 C. C. A. 493.]

**10. SAME—CONDITIONS—PERFORMANCE—TENDER.**

In a suit to compel specific performance of a contract to purchase the stock, franchises, and property of a coal corporation, it was not a condition precedent to complainants' right to such relief that they should have tendered a deed to the property or other papers necessary to transfer the rights intended to be conveyed, defendants having expressed a purpose to repudiate the contract.

**11. SAME—QUANTITY OF LAND—DEFICIENCY—EVIDENCE.**

In a suit to enforce specific performance of a contract for the sale of a coal mining corporation's property represented to cover 4,073 acres of coal, evidence *held* insufficient to warrant a finding that there was a material deficiency in the coal land the corporation was empowered to convey.

In Equity.

Robert McCullough, William E. Gheen, Samuel Humes, J. W. Christman, H. A. Miller. and Thomas A. Davies, citizens of Pennsylvania, have filed their

original bill in this court against Howard Sutherland and Stephen B. Elkins, citizens of West Virginia, and the Pennsylvania Steam Coal & Coke Company, a West Virginia corporation, in which they allege themselves to have been, prior to the 28th day of March, 1903, the officers, directors, and sole owners of all the capital stock of two West Virginia corporations, the said Pennsylvania Steam Coal & Coke Company and the Cheat Valley Railroad Company; that the property of the coal company consisted principally of about 4,000 acres of coal lands situate in Preston county, W. Va., and the property of the railroad company consisted of a railroad with its franchises, rolling stock, rights of way, etc., designed to extend from Rowlesburg in said Preston county, along and adjacent to said coal field, to the Pennsylvania state line beyond Brandonsville, about seven miles of which, starting at Rowlesburg, was built; that the railroad was necessary to the operation of the coal field, and had been bought by the plaintiffs to make such operation and transportation of the coal to market possible; that on several occasions prior to March 28, 1903, the defendant Howard Sutherland had called on plaintiffs, seeking to purchase this railroad, but plaintiffs had refused to sell the road without selling at the same time the coal field, and finally these negotiations resulted in two contracts, both dated March 28, 1903, whereby, aided by a supplement added June 5, 1903, the plaintiffs agreed to sell to Sutherland all the capital stock, rights, franchises, and property of the coal company, and also all of the capital stock, rights, franchises, and property of the railroad company, for a consideration of $200,000 in cash upon delivery of the properties; that said Sutherland made payments of $5,000 on such purchase price; that on June 5, 1903, Sutherland pressed for immediate delivery of the railroad, as it was a going concern, and gave as a reason for not taking over the coal field at the same time that certain farmers (from whom the coal had been purchased) had bonds or claims against the property which constituted clouds upon its title which it was the duty of plaintiffs to remove, and that immediately after such claims were satisfied and such clouds removed the coal field would be taken over and paid for; that upon this representation the railroad was on that day transferred to and possession thereof given to said Sutherland and a further payment of $102,500 was made by him, leaving $95,000 still due plaintiffs upon the contracts; that, immediately after, plaintiffs paid off and discharged the claims of the farmers; that Sutherland then refused to comply and take over the coal property and pay the balance of the purchase price of the properties, setting up that Lakin and others had a suit pending for a money demand against the coal company; that plaintiffs offered to indemnify against this suit, but Sutherland refused to accept such indemnity, and they then proposed that he retain purchase money to the amount of the demand made in this suit until its determination, which he likewise refused to do; that in September, 1903, the Lakin suit was in court determined against the plaintiffs therein and in favor of the coal company, and thereupon Sutherland and Elkins (it having been alleged that Elkins was a silent partner with Sutherland in the contracts) both still refused to comply.

The allegations of said bill are further "that plaintiffs have tendered, and have at all times been ready, willing, anxious, and able, to tender to defendants a good and sufficient deed of general warranty, clear of all debts and incumbrances, as in, and by, their said written articles of agreement they had agreed to do, in and to all of the capital stock, rights, property, and franchises of the Pennsylvania Steam Coal & Coke Company and of the Cheat Valley Railroad Company, and now renew such tender and willingness, and now bring into court such deed of conveyance and every necessary muniment of title to the property of the Pennsylvania Coal & Coke Company and proffer delivery of the same to defendants."

The prayer of the bill is for specific performance and a decree for the $95,-000 purchase money unpaid. To this bill the defendants filed a written motion to dismiss, and each a separate demurrer, Sutherland alleging some 10 grounds and Elkins 14 therefor, which motion to dismiss and said demurrer were overruled, and thereupon the defendants have filed their joint answer, to which plaintiffs have filed replication, in which answer they admit the execution of the contracts, that Sutherland in the transactions was acting for

Elkins, who furnished the money, and was beneficially interested in both contracts. They allege the properties to have been separate and distinct ones, held by separate and distinct corporations, and they deny that the two contracts were one and the same transaction, that the railroad was necessary to the coal field, but, on the contrary, allege that another railroad from Morgantown was being built nearer to these lands. Sutherland admits, substantially, in this answer, the negotiations had prior to March 28, 1903, the date of these contracts which he terms "options," and also admits, "that those with whom he discussed the question of said option sought to induce him to purchase the two properties in a single contract; but, realizing from the location of said lands that the coal claimed by the parties with whom he was negotiating would be of doubtful value, and being desirous of securing the railroad in the event the coal property should prove of slight value, he declined to unite the options for the two properties in the same contract"; but he declines either to admit or to deny "what may have been in the minds of complainants with whom he was negotiating for these properties as to whether they regarded the two contracts as one transaction, and dependent for their enforcement one upon the other," and denies that they communicated such idea, but that, on the other hand, they concealed it from him, if they did have it in mind. He does not, on the other hand, allege that he informed them as to what motives he had for requiring the contracts to be two, instead of one. He alleges he was to pay $100,000 for each of said properties and paid $2,500 down on each when contracts were signed. The defendants jointly deny the ability of plaintiffs to comply; deny that any tender has ever been made of a deed for the coal field of the capital stock, etc., of the coal company, or of the contracts, maps, surveys, notes of borings, cores, etc., or of the abstracts of title, books, and papers relating to the coal company. They deny that they have been called upon to elect whether they will take the land subject to the mortgage existing upon the lands or free from it, which right of election the contract gave them. They deny that the coal field embraces anything like 4,073 acres which the contract required it to contain, and on this account deny the plaintiffs' right to specific performance. Sutherland denies that on June 5, 1903, the plaintiffs were induced to transfer the railroad to him because "a delay in the transfer of the same would prejudice his interest," but avers that "he notified the said parties that, if they failed to settle as to the railroad property at that time, he would enforce his rights under the terms of said contract either in law or equity as might be deemed expedient." He admits that he refused at that time to take the coal property, but alleges it was because "the provisions of the contract as to its title, number of acres underlaid with coal, of merchantable quality, was not demonstrated or shown, and none of the conditions precedent provided for by said contract were then and there offered to be performed by complainants or any of them." On the other hand, he says all these conditions precedent were performed touching the railroad, and for this reason he then and there took it over, and both respondents admit that Elkins went into full possession of it. They also admit the payment of $2,500 at that time on the coal contract, and that they did not tender the residue. They then deny the jurisdiction of this court, for the reason that the coal company's interest is with complainants, and the diversity of citizenship is therefore destroyed. Samuel Humes having died pending suit, a bill of revivor has been filed and matured.

P. J. Crogan, for plaintiffs.
Reese Blizzard and F. P. Moats, for defendants.

DAYTON, District Judge (after stating the facts as above). I have carefully gone over again the technical defenses raised by the demurrer and the motion to dismiss for want of jurisdiction, and have discovered nothing to cause me to reach any other or different conclusion than the one arrived at upon former hearing thereof. In my judgment, under the facts alleged and now fully proved, these six nonresident plaintiffs owned all the stock of the Pennsylvania Steam Coal &

Coke Company, composed its board of directors and officers, and had full power, without the aid of this court of equity, to fully comply with all the essential and vital requirements of their contracts, to wit, to turn over to the defendants all the stock, rights, franchises, interests, and property of this company. They had but to control their own action to do this. While the contracts require the execution of a deed for the coal lands, and while the execution of such deed was hardly required in order to carry out the true intent and purposes sought to be accomplished, yet it is true, as shown by the evidence, that this action on behalf of the company has been done, as it had in the very nature of things to be done, by the authorization of these six stockholders and directors and of them only, for no other interest of any kind was in any way interested.

This coal corporation is therefore in my judgment a wholly unnecessary party, as such, and can well be dismissed from the proceeding. The grave doubt that existed in my mind upon former hearing as to how far defendant Elkins could be bound in these transactions has been wholly dissipated by the allegations of his answer conjoint with his codefendant Sutherland, in which he admits that the latter was acting in effect as his agent with full authority, that he has beneficial interests in the contracts, and has taken possession of the railroad property under one of them. Viewing these two contracts as substantially one, for reasons hereafter to be stated, and regarding the actual conveyance of the coal field by deed to be substantially immaterial to the true intents and purposes of the contracts (for the transfer of the stock, franchises, and rights of the company unincumbered accomplishes such transfer of its said realty just as effectively as it could be by deed), there are three reasons why I think the statute of frauds, requiring contracts for the sale of realty to be in writing, set up in his fifth ground of demurrer by Elkins, will not avail his release from liability. First. Because there is here a sufficient "memorandum or note in writing," clear and distinct contracts in fact touching such sale of real estate signed by Sutherland, his agent. "A person owning lands may authorize another to make a contract for the sale thereof; and, if a contract be made under such authority, the owner of the lands may be charged by virtue of the contract, provided there be a memorandum thereof in writing signed by the person authorized to make it. The signing by the agent of his own name as agent is sufficient." Conaway v. Sweeney, 24 W. Va. 643. Kennedy v. Ehlen, 31 W. Va. 540, 8 S. E. 398, is exactly in point. In that case Ehlen was held bound for a sale of real estate made direct to Buchanan, although his name was not mentioned in the writing and his liability was not known, simply because he had an interest in the purchase and Buchanan was acting as his agent. These cases and others construe the West Virginia statute of frauds, and, under well-settled principles, must be followed by this court. Second. Because there has been part performance, as I have said, by reason of the taking over of the railroad by Elkins. A part performance makes the contract enforceable specifically in equity. Middleton v. Selby, 19 W. Va. 168; Kennedy v. Ehlen, 31 W. Va. 558, 8 S. E. 398; Lester v. Lester, 28 Grat. 737. Third. Because, notwithstanding the statute, courts of equity, in order to

defeat a fraud, will compel the specific execution of a parol contract for the sale of lands if the contract is established by clear and convincing proof. Boyd v. Cleghorn, 94 Va. 780, 27 S. E. 574.

Touching the other technical grounds assigned on demurrer, I desire next briefly to consider a little further the ninth one, assigned by Elkins, upon which much stress was laid. It seems that this coal company had executed a mortgage upon its property to the Colonial Trust Company, of Philadelphia, trustee, to secure $135,000 in bonds payable to bearer, $65,000 of which were outstanding. It is insisted that this trustee was a necessary party to this suit, and at first blush it might appear that this position was well taken. The answer, however, I conceive to be is that this mortgage was existent at the time these contracts sought to be specifically enforced were executed, and they were expressly made with the fact of its existence in view by the parties. The bonds under its terms were negotiable and ran 10 years, and in the contracts relating to the sale of the coal lands was this provision:

"Further, the said first parties shall either fully pay all the outstanding indebtedness of said company, including said bonds of $65,000.00 and interest on same to date of said final transfer, and procure the release of said deed of trust and the cancellation of said bonds, or such a reduction from said above named purchase price shall be made as will amply cover all such indebtedness, at the option of said second party. The second party reserving to himself, or his assigns, the option either to require the first parties to pay the said bonds and interest and to procure the release of the deed to cancel the bonds, or to buy the property subject to said bonds and interest and to deduct the amount thereof from said purchase price."

In view of this express stipulation in the contract, how does it become necessary for this trustee in the mortgage to be made a party to enforce specific performance? By the terms of the contract, these plaintiffs undertook, if required, to pay the bonds and secure release of the mortgage. On the other hand, the defendants had right to take the lands subject to the mortgage and pay the bonds when due, retaining the amount out of the purchase price. In neither event would or could the trustee in the mortgage have any interest or be affected by this controversy. The plaintiffs have alleged their ability and willingness to perform, at any and all times, these contractual exactions upon them, and now insist that the defendants having failed to elect which course they would require, but, on the contrary, having repudiated the contract entire, the election now rests with them, and I am inclined to regard this view sound under the authority of 3 Page on Contracts, § 1391.

I cannot understand what force there can be in the contention of defendants to the effect that, because the plaintiffs did not notify them to make this election (which in this answer they say they did not, but which the evidence clearly shows they did), therefore there exists no right in the plaintiffs to require them to perform the contract at all. The logic of this position would seem to be that because they were not notified to do what they had expressly reserved the right to do, and which it was their plain duty to do, they cannot be required to do anything. Equity and good conscience will hardly sustain such a position. When a man undertakes by contract to do a thing, he must do it without being told to do so. Finally, in the

fourteenth ground, it was insisted upon for demurrer that the defendants Elkins and Sutherland could not have enforced specific performance of this coal contract, and therefore want of mutuality is shown such as will bar enforcement of it against them. Why could they not, by the aid of a court of equity, have enforced this contract against these plaintiffs if the shoe was on the other foot? Could not such court have enjoined the disposition, by these six plaintiffs, of the whole capital stock of this company which was owned by them, and required its transfer to defendants, thereby substantially meeting every requirement of the contract save and except that of the payment of the company's debts? And could it not have convened the creditors and out of the purchase money paid these debts? Could it not have enjoined any disposition of the property by the company until such transfer of stock could be decreed, after which, as sole stockholders, the plaintiffs could have organized the company, managed it at will, and caused any deeds to be made by it they might desire? I think so, and therefore I regard this position untenable.

Coming now to the cause on its merits, it is not my purpose to discuss the facts further than to say that, in behalf of the plaintiffs, the evidence of four of their number, the son of one who acted in part of the transactions for his father, and of two attorneys of theirs in the negotiations, is taken, while Elkins does not testify at all, Sutherland but briefly and with but little conflict with plaintiffs' testimony, and the evidence of Paul, hereafter to be referred to, alone constitutes the evidence of the defense. I regard the evidence as fully maintaining the contentions of the plaintiffs. It establishes beyond question, I think, these facts that Elkins wanted, and wanted badly, the railroad, but did not want the coal field; that Sutherland was sent to purchase the railroad, but was flatly refused a sale of it alone by the plaintiffs, who would only sell it in connection with the coal field; that this negotiation was had just prior to March 28, 1903, with Gheen, Humes, and C. B. McCullough, son of plaintiff McCullough, and resulted in an agreed price of $200,000 for both properties; that Sutherland undertook to have the contract drawn at Williamsport, where he was going to spend the night with relatives, did have the two original ones drawn, returned, and, upon objection raised by Humes to there being two, he assured them "both properties would go together"; that by the contract he was given until April 18th following to examine the coal field and the title before closing, but, in fact, took until June 3d, when he returned in company with Attorney Faulkner, secured also the service of Munson, a local attorney, and met four of the plaintiffs with Reardon and McCormick, their attorneys; that he earnestly insisted upon taking over immediately the railroad, but not the coal property; that this was strenuously objected to, and to meet this objection he made most earnest protestations of good faith, revealed Elkins to be his principal, referred to his high position and character, and assured plaintiffs that, so soon as the "farmer bondholders" were satisfied, the coal property would be taken over, and then tendered and paid $2,500 additional of the purchase price; that under his assurances and those of Faulkner the supplemental contract was executed, and the rail-

road was turned over; that one of the plaintiffs and **young** McCullough went down next day to Kingwood and paid off the farmers, and on their way home notified Sutherland to come on and take over the property; that objection was then made by Sutherland to doing this because a suit was pending against the coal company by Lakin and others upon a money demand which might result in a lien against it; that plaintiffs offered to indemnify against this, but this was refused, and the matter remained so, until in September, when the local court decided this case in favor of the company; that Sutherland was notified and then objected that an appeal might be taken by Lakin et al., and then in November informed the plaintiffs that he had long since regarded the contract as at an end "because they were unable to comply with it"; that on June 25th he had been asked by letter to make his election as to whether he would take subject to the mortgage or not, but had never expressed his election; that Elkins was appealed to and ratified and approved the repudiation of the contract by his agent, alleging, as reasons, that the plaintiffs had never been in position to make title; that his engineers reported that the coal was not persistent; that it could not possibly be shown that there was coal under all the land; that one engineer reported that there was a disturbance in the coal field caused by the anticlinal, and, "added to all this, the price of coal lands has considerably decreased since Mr. Sutherland's contract was entered into."

It is to be remembered that the granting of the equitable remedy of specific performance "is, in the language ordinarily used, a matter of discretion, not of an arbitrary, capricious discretion, but of a sound, judicial discretion, controlled by established principles of equity, and exercised upon a consideration of all the circumstances of each particular case. Where, however, the contract is in writing, is certain in its terms, is for a valuable consideration, is fair and just in all its provisions, and is capable of being enforced without hardship to either party, it is as much a matter of course for a court of equity to decree its specific performance as for a court of law to award a judgment of damages for its breach." Pom. Eq. § 1404.

Without entering into an elaborate discussion of the law governing the administration of this equitable remedy, it may be well to say here that, as in all other equitable remedies, conditions existing in different states and localities have established different precedents. In our state, where many difficulties have existed touching land titles, our Supreme Court of Appeals has gone far to extend the application of this remedy. For instance, in Bennett v. Pierce, 50 W. Va. 604, 40 S. E. 395, it has been held:

"Though at the date of a conveyance of land, retaining a lien for purchase money, the title of the grantor is defective, yet, if at the time when he asks a decree to enforce that lien in a suit brought for the purpose the title has become good and valid, the original defect of title will not debar the grantor from such relief."

In Rader v. Neal, 13 W. Va. 373, it is held:

"Where a purchaser knows, when he makes his contract, that there is a defect in the title, and that it will take a considerable time to remove it, or acquires this knowledge after his purchase, and acquiesces in the delay, or pro-

ceeds, with knowledge of the defect, in the execution of the contract, he cannot afterwards complain"—citing Vail v. Nelson, 4 Rand. 478, 481; Goddin v. Vaughn's Ex'r, 14 Grat. 125.

And it has been held, further, that it is immaterial if plaintiff has title at all or whether title be outstanding in another, or whether it be defective or not at the time of bringing his suit, provided he can confer such title at any time before the decree granting him relief. Tavenner v. Barrett, 21 W. Va. 656; Core v. Wigner, 32 W. Va. 277, 9 S. E. 36. Touching the insistence of the defendants that no tender was made of the stock of the coal company, of the contracts held by it, the maps, surveys, abstracts of title, boring, etc., of the lands and of the deed specified in the contract whereby the right to demand specific performance became lost to the plaintiffs, it is sufficient to say that the courts of equity under modern administration, and especially so in this state, have swept away these technicalities as shown by such cases as Vaught v. Cain, 31 W. Va. 424, 7 S. E. 9; Koon v. Snodgrass, 18 W. Va. 320; Poling v. Parsons, 38 W. Va. 80, 18 S. E. 379; Thompson v. Lyon, 40 W. Va. 87, 20 S. E. 812; Creigh's Adm'r v. Boggs, 19 W. Va. 240; Blanton v. Kentucky, etc., Co. (C. C.) 120 Fed. 318; Pollock v. Brainard (C. C.) 26 Fed. 732; Cheney v. Libby, 134 U. S. 68, 10 Sup. Ct. 498, 33 L. Ed. 818. From these cases we find it is not a prerequisite to specific performance that tenders be made of deed, papers, property, or money where the opposite party has especially expressed a purpose not to comply with but to repudiate the contract.

This brings us to the last matter of defense set up and sought to be established by the evidence of Paul alone, to wit, the lack of the contract number of 4,073 acres of coal. If it was clearly shown that there was any considerable failure in this particular, this court would be very prompt in granting relief, either by an abatement of the purchase price, if that could under the terms of the contract properly be done, or, if not, by rescinding all the contracts and restoring the parties to their original condition. Believing, as I do, that the sale of the railroad and the coal property was substantially one and the same transaction, and that to allow the defendants to take the railroad and not the coal would be to allow them to perpetrate a palpable fraud upon the plaintiffs, if I had to construe this contract as allowing no abatement for lack of acres of coal, as insisted on by defendants, then I would feel constrained to allow plaintiffs to file an amended bill, praying rescission of all these contracts, and would decree accordingly. But, as I view this testimony, it is not necessary for me to construe this contract in this particular, for I do not regard the facts and evidence sufficient to sustain the contention that there is any deficiency. In the first place, the contract gave to Sutherland from its original date of March 28th until April 18th to examine into this very matter. He took until June 3d, and then raised no question as to this. He, in fact, made no objection on this ground until his answer in this cause. Paul, the witness, went on to some land indicated to him as this field by Flynn and Matheny. He did not know it was this land, and Flynn and Matheny are not called to state it was. He made no survey. He stepped off and estimated what he believed would amount to 215 acres of land that was

barren of the Upper Freeport vein. It is known from the geology of this section of West Virginia that these lower coal measures generally consist of the Masontown, Upper Freeport, Lower Freeport, and Kittaning veins, and that frequently two, or even more, of these veins are found in merchantable quantity under the same land. Paul made no test. He believed the Upper Freeport, and therefore necessarily the Masontown, veins to be absent on a part of the land which he stepped over and estimated to be 215 acres. He could not tell whether the Lower Freeport or Kittaning veins were under this 215 acres or not. He only believed not, but could not tell. This testimony seems to me to be wholly insufficient upon which to base this defense.

I am of opinion that the plaintiffs are entitled to the relief prayed for, and will so decree.