# CHENEY v. LIBBY.

APPEAL FROM THE CIRCUIT COURT OF THE UNITED STATES FOR THE DISTRICT OF NEBRASKA.

No. 724. Submitted December 4, 1889. — Decided March 3, 1890.

Time may be made of the essence of a contract, relating to the purchase of realty, by the express stipulations of the parties; or it may arise by implication from the very nature of the property, or the avowed objects of the seller or the purchaser; and unless its provisions contravene public policy, the court should give effect to them according to the real intention of the parties.

But even when time is made material by express stipulation, the failure of one of the parties to perform a condition within the particular time limited will not in every case defeat his right to specific performance, if the condition be subsequently performed, without unreasonable delay, and no circumstances have intervened that would render it unjust or inequitable to give such relief. The discretion which the court has to decree specific performance may be controlled by the conduct of the party who refuses to perform the contract because of the failure of the other party to strictly comply with its conditions.

When a contract for the purchase of land provides that it shall be forfeited if the vendee fails to pay any instalment of the purchase price at the time limited, the failure of the latter to make a tender of payment, in lawful money, of a particular instalment on the very day it falls due, will not deprive him of the right to have specific performance, if such failure was superinduced by the conduct of the vendor, and if the vendee, without unreasonable delay, tenders payment, in lawful money, after the time so limited.

A provision in the contract forbidding its modification or change except by entry thereon in writing signed by both parties, coupled with a provision that no court should relieve the purchaser from a failure to comply strictly and literally with its conditions, has no application when the apparent cause of the failure to perform such conditions was the conduct of the vendor.

If the vendor notifies the purchaser that he regards the contract as forfeited, and that he will not receive any money from him, the latter is not required, as a condition of his right to specific performance, to make tender of the purchase price. It is sufficient if he offer in his bill to bring the money into court.

A note for the purchase price of land is made payable at a particular time and at a particular bank. The payör is ready at such time and place to pay, and offers to pay, but the bank has not received the note for collection; *Held,*

(1) The bank is not authorized to receive the money for the payee by reason simply of the fact that the note is payable there;

(2) The tender of payment is not payment;

(3) A decree of specific performance should not become operative until the money is brought into court;

(4) The payee is not entitled to interest unless it appears that the payör, after the tender, realized interest upon the money.

In EQUITY. The case is stated in the opinion.

*Mr. Adams A. Goodrich* for appellant.

*Mr. Samuel P. Davidson* for appellee.

MR. JUSTICE HARLAN delivered the opinion of the court.

This is a suit to compel the specific performance by the appellant, Cheney, of a written agreement entered into May 28, 1880, between him and the appellee, Libby, whereby the former demised and let to the latter the possession and use of, and contracted, bargained and agreed to sell to him, two sections of unimproved land in Gage County, Nebraska. The

defendant claimed that the contract was forfeited, long before this suit was brought, by Libby's failure to comply with its stipulations. Upon that ground, he resists the granting of the relief asked. The Circuit Court adjudged that the plaintiff was entitled to a decree.

The question to be determined is, whether there was any such default upon the part of the plaintiff, Libby, as deprived him of the right to specific performance.

The sum agreed upon for the possession, use, occupancy and control of the land was $1361.60 yearly, represented in Libby's notes, and in the taxes, assessed and to be assessed against the land. The price for the land was $8960, of which $1600 was paid at the date of the contract. The balance was to be paid, "without notice or demand therefor," in annual instalments at the times specified in promissory notes, of even date with the contract, which were executed by Libby to Cheney, at Tecumseh, Nebraska. The notes were made payable to the order of Cheney, at the office of Russell & Holmes, private bankers in that city. Eight of the notes represented the balance of the principal debt — each one being for $920 — and were payable respectively in three, four, five, six, seven, eight, nine and ten years after date. The remaining ten notes represented the annual interest.

Libby agreed to meet the notes as they respectively matured, pay the taxes on the land for 1880 and subsequent years, and, during that year, (the weather permitting,) break two hundred acres, and build on the land a frame barn of sixteen feet by twenty, and a frame dwelling-house of a story and a half. Cheney undertook to pay the taxes of 1879 and previous years, and bound himself to convey the land, in fee simple, with the ordinary covenants of warranty, (reserving the right of way that might be demanded for public use for railways and common roads,) upon the payment by Libby of the several sums of money aforesaid at the times limited, and the strict performance of all and singular the conditions of the contract.

It was further stipulated between the parties: That "time and punctuality are material and essential ingredients in this contract;"

That if Libby failed to perform and complete all and each of the payments, agreements and stipulations in the agreement mentioned, "strictly and literally," the contract should become void, in which event all the interests created by the contract in favor of Libby, or derived from him, should immediately cease and determine, and revert to and revest in Cheney, without any declaration of forfeiture, or reëntry, and without any right in Libby of reclamation or compensation for moneys paid or services performed;

That in case the contract was forfeited, Cheney could take immediate possession of the land with all the crops, improvements, fixtures, privileges and appurtenances thereon or appertaining thereto, Libby to remain bound for all taxes then assessed against the premises, and all instalments of principal or interest then due on the contract to be regarded as rent;

That whenever one-half of the purchase price was paid, with all accrued interest and taxes, Cheney should execute a deed, as provided for in the contract, and take notes and a mortgage for the remaining payments to run the unexpired time; and,

That when Libby's right to purchase the land terminated by reason of non-performance of his covenants, or his failure to make the payments, or any of them, at the time specified, he should be deemed to have only the rights of a tenant, and to hold the land under the contract as a lease, subject to the statute regulating the relation of landlord and tenant; with the right in Cheney to enforce the provisions of the contract, and recover possession of the land, with all the fixtures, privileges, crops and appurtenances thereon as if the same was held by forcible detainer.

The agreement also contained these stringent provisions: That no court should relieve Libby from a failure to comply strictly and literally with the contract; that no modification or change of the contract could be made except by entry thereon in writing signed by both parties; and that no oversight or omission to take notice of any default by Libby should be deemed a waiver by Cheney of the right to do so at any time.

Libby went into possession under the contract. He and

those in possession under him had, prior to the commencement of this suit on the 26th of February, 1887, broken up and cultivated most of the land, and made improvements thereon of a permanent and substantial character. Nearly all of these improvements were made prior to the first of January, 1885. He met all the obligations imposed upon him with respect to the breaking up of the land and its improvement by the erection thereon of buildings. His evidence, which is uncontradicted, was: "We have broken up and cultivated about 1200 acres; built five houses and stable and outbuildings to each house; made wells to each house; erected two wind-mills; fenced one whole section with wire and posts and fenced half of other section with hedge; we have set out some fruit trees and shrubbery, all to the value of about ten thousand dollars; all was done under and in pursuance of this contract."

He, also, met promptly all the notes given for principal and interest maturing prior to 1885. The total amount paid by him prior to that date, including $1600 paid at the execution of the contract, was in excess of $5000.

But the defendant insists that there was such default upon the part of the plaintiff with respect to the notes maturing May 28, 1885, as worked a forfeiture of the contract, and, consequently, that specific performance cannot be decreed. The precise grounds upon which this contention rests, as well as those upon which the plaintiff relies in support of his claim for relief, cannot be clearly understood without a careful scrutiny of all that passed between the parties in reference to the lands in question.

The plaintiff resided in Iowa, while the defendant resided at Jerseyville, Illinois. The notes given by the former were upon blanks furnished by the latter's agent, who caused them to be made payable in Tecumseh, Nebraska, at the private bank of Russell & Holmes, through whom the defendant had, for many years prior to 1880, made collections, and with whom he had kept an account. The first payment under the contract was made in bank drafts delivered to the defendant's agent in Tecumseh. All the other notes falling due in 1880 to 1884, inclusive, except the interest note maturing in 1882,

were paid by bank drafts sent to Russell & Holmes, who placed the proceeds to the credit of Cheney in their bank. The checks of the latter upon that bank, on account of those deposits, were always paid in current funds. The draft to pay the interest note for 1882 was also sent to Russell & Holmes, but as Cheney had not transmitted that note to them, the draft was forwarded to him. He received it and sent the note to Libby. In no single instance prior to 1885 did he make objection to the particular mode in which Libby provided for the payment of his notes, or intimate his purpose to demand coin or legal-tender notes in payment. In every instance, except as to the interest note for 1882, the notes were paid at the banking house of Russell & Holmes, and by drafts sent to and used by them for that purpose.

But it is quite apparent from the evidence that Cheney, in 1885, indulged the hope that he could bring about a forfeiture of the contract for non-compliance upon the part of Libby with its provisions, and that he would, in that or some other way, get the land back. It is proper to advert to the circumstances justifying that conclusion.

On the 4th of March, 1885, — all previous instalments having been punctually met — Libby offered, in writing, to pay *all* the principal notes mentioned in the contract, as well as the interest note due May 28, 1885, if a deed was made to him. To this offer Cheney replied, under date of March 19, 1885: "Your letter of the 4th has just reached me. I have no papers with me and cannot attend to the matter as you request. I expect to go to New Orleans to the Exposition and to be at home in time to see to it properly. If I am behind time no harm will come to you." Libby wrote again, under date of May 20, 1885, renewing the offer contained in his letter of March 4. Under date of May 23, 1885, — only five days before the notes for 1885 matured, — Cheney replied: "Yours of 20th is received. I think it probable that I can do as you suggest, but I will be in Beatrice [the county seat of Gage County, where the lands are] between the 1st and 10th of June on other business, and will then make inquiries and see if I can lend the money to good hands, and will then let you know more certainly."

On the 26th of May, 1885, Libby sent to Russell & Holmes a draft upon the First National Bank of Omaha, Nebraska, made by one Stuart, a private banker doing business at Madison, in the same State, for $1251.20, which was the amount of Libby's two notes for principal and interest that matured May 28, 1885. It was sent in payment of those notes, and was received for that purpose by Russell & Holmes. They accepted it for the amount of money named in it, and were, therefore, ready to take up Libby's two notes when presented for payment at their office.

On the 28th of May, 1885, A. W. Cross, of the First National Bank of Jerseyville, Illinois, — where Cheney resided, — appeared at the banking-house of Russell & Holmes, and made a deposit of $5000; all in current funds, and a good portion of it *in bills of his own bank*. While there he inquired of Russell & Holmes (without disclosing the reason for his inquiry) whether they kept a "legal-tender revenue [reserve], as national banks were required to do." He was told that they did not, but that a supply of legal-tender was on hand. About two o'clock of the 1st of June — which, as May 31 fell on Sunday, was the last day of grace for Libby's two notes due in 1885, Neb. Stat. c. 41, § 8 — one of Cheney's attorneys went into the bank of Russell & Holmes, and asked if he could be given $5000 in legal-tender notes in exchange for other currency. His request was complied with. At a later hour of the same day Cheney appeared in the bank, without having responded to Libby's offer, twice made, to pay all the notes for the principal debt, and the interest note maturing in 1885. He came there with checks, drawn by Cross, to be cashed, and asked as *an accommodation* to him that they be paid in legal-tender notes. He was promptly accommodated to the extent of $2500. But when he asked for $2500 more in legal-tender notes, Holmes suspected there was a scheme to exhaust his bank of legal-tender notes, and refused to comply with this request. After Russell & Holmes had thus, by way of accommodation, paid to Cheney and his attorney seven thousand five hundred dollars in legal-tender notes — but not until the hour for closing the bank, on that

day, against the public had passed — Libby's two notes were presented by Cheney, and payment thereof demanded in coin or legal-tender notes. The bank offered to pay in current funds, as they had previously done in respect to Libby's notes, but Cheney declined to take in payment anything except coin or legal-tender notes. The notes were then placed by him in the hands of a notary, who was conveniently present, and the latter presented them for payment, announcing that he would not receive anything except United States notes or legal-tender funds. Payment in such funds was refused by the bank and the usual protest was made. The notary and Cheney then left the room, the latter saying, before leaving, that "he would call in the morning." But he did not call the next or upon any subsequent day.

Within fifteen or twenty minutes after Cheney and his notary left the bank, Holmes, of the firm of Russell & Holmes, went to the office of the notary to find Cheney and pay the notes in the funds demanded. But Cheney was not there, and the notes were in his hands. Inquiry was made at the principal hotel and at other places, but he could not be found. Holmes was informed that he had left town.

. Libby having been notified of the protest of the notes, notwithstanding he had, in due time, sent a bank draft to Russell & Holmes to be used in paying them, directed Stuart, the banker at Madison, Nebraska, to go immediately to Tecumseh. The latter arrived there on the 9th of June, and, having learned what passed between Cheney and Russell & Holmes, determined to pay off the notes in such funds as Cheney demanded. He informed the notary, who had protested the notes for non-payment, that he was then ready, in behalf of Libby, to pay them in gold. The latter did not have the notes, did not know where Cheney had gone, and said that the latter "did not want the money, but that he wanted the land back."

. Stuart having knowledge of Cheney's letter, in which he notified Libby of his purpose to visit Beatrice between the 1st and 10th of June, went to that place in search of Cheney, but could not find him.

Libby wrote to Cheney, under date of June 12, 1885, informing him that gold was deposited at Russell & Holmes' office to pay the two notes due May 28, 1885. This letter was received by Cheney in due course of mail. On the 20th of June, 1885, the latter enclosed to Libby twelve unpaid notes, (including the two due May 28, 1885,) saying that the contract of May 28, 1880, was " terminated and ended by your failure to pay the two notes due May 28, 1885, and otherwise to comply with the contract, which is now null and void." How Libby had " otherwise " failed to meet his obligations under the contract does not appear. Under date of June 23, 1885, Russell & Holmes advised Cheney by letter of the fact that they were authorized by Libby to pay, and they were ready to pay, the notes due May 28, including protest fees, in legal-tender notes or coin. Libby, under date of June 25, 1885, replied to Cheney's letter, saying: "I refuse to accept said notes, excepting the two which were paid, and have this day sent them to your bankers, Messrs. Russell & Holmes, of Tecumseh, Neb., for your use and benefit and subject to your order. I shall make payments as fast as they become due, and shall require you to execute a conveyance of the land in accordance with the terms of the contract. It will be useless for you to send me any of these notes, except you send them for payment." Under date of June 29, 1885, Russell & Holmes advised Cheney that they had received from Libby his notes, amounting to $6679.20, subject to his, Cheney's, order. The latter wrote, July 9, 1885, in reply to Libby's letter of June 25th, that he did not recognize the notes placed with Russell & Holmes as being subject to his order.

On the 20th of August, 1885, Libby, by his attorney, made a tender to Russell & Holmes of $120 in gold coin as a balance of one-half of the purchase money, and offered to surrender the contract and execute a mortgage and notes for the balance of the purchase money, as stipulated in the contract, and demanded a deed; of all which Cheney was notified. The latter replied, under date of August 22, 1885, that he would not receive any money from Libby, and refused to make a deed.

It further appears that the plaintiff punctually paid into the bank of Russell & Holmes the amounts of the notes due in 1886 and 1887. The funds remained in that bank and are now there, subject to Cheney's order, on presenting the notes. Of these payments he was promptly informed.

Shortly before the commencement of this suit Libby again offered to Cheney to pay in cash all the unpaid portion of the principal debt named in the contract, and all interest due at that date. He also renewed his offer to execute a mortgage on the land to secure all unpaid instalments not due, and demanded a deed. But those offers being declined, the present suit was brought.

The peculiar wording of the written contract renders it somewhat doubtful whether there was a sale of the lands to the appellee to be made complete by a conveyance of the legal title or defeated altogether, according to his performance or failure to perform the conditions upon which he was to receive a deed; or whether he was simply given possession, paying a fixed amount annually, for use and occupancy, with the privilege of purchasing and with the right to demand a conveyance in fee simple, upon the performance of those conditions. Taking the whole contract together, we incline to adopt the former as the true interpretation. Such was the view taken by the Supreme Court of Nebraska of a similar contract as to land between Cheney and one Robinson. *Robinson* v. *Cheney*, 17 Nebraska, 673, 679. But it is not necessary to express any decided opinion upon this question; for, in any view, it is clear from the contract, not only that appellant could retain the legal title until the appellee's obligations under it had all been performed, but that he could resume possession immediately upon the failure of the appellee to meet, punctually, any of the conditions to be performed by him. Time may be made of the essence of the contract " by the express stipulations of the parties, or it may arise by implication from the very nature of the property, or the avowed objects of the seller or the purchaser." *Taylor* v. *Longworth*, 14 Pet. 172, 174; *Secombe* v. *Steele*, 20 How. 94, 104; *Holgate* v. *Eaton*, 116 U. S. 33, 40; *Brown* v. *Guarantee Trust Co.*, 128 U. S. 403, 414. The par-

ties in this case, in words too distinct to leave room for construction, not only specify the time when each condition is to be performed, but declare that " time and punctuality are material and essential ingredients " in the contract ; and that it must be " strictly and literally " executed. However harsh or exacting its terms may be, as to the appellee, they do not contravene public policy; and, therefore, a refusal of the court to give effect to them, according to the real intention of the parties, is to make a contract for them which they have not chosen to make for themselves. 1 Sugden on Vendors, 8th Amer. Ed. 410 [268] ; *Barnard* v. *Lee,* 97 Mass. 92, 94 ; *Hipwell* v. *Knight,* 1 Younge & Coll. Exch. 401, 415. These observations are made because counsel for the appellant insists, with some confidence, that an affirmance of the decree below will necessarily be a departure from the general principles just stated.

But there are other principles, founded in justice, that must control the decision of the present case. Even where time is made material, by express stipulation, the failure of one of the parties to perform a condition within the particular time limited, will not in every case defeat his right to specific performance, if the condition be subsequently performed, without unreasonable delay, and no circumstances have intervened that would render it unjust or inequitable to give such relief. The discretion which a court of equity has to grant or refuse specific performance, and which is always exercised with reference to the circumstances of the particular case before it, (*Hennessy* v. *Woolworth,* 128 U. S. 438, 442,) may, and of necessity must often be controlled by the conduct of the party who bases his refusal to perform the contract upon the failure of the other party to strictly comply with its conditions. *Seton* v. *Slade,* 7 Ves. 265, 279 ; *Levy* v. *Lindo,* 3 Merivale, 81, 84 ; *Hudson* v. *Bartram,* 3 Madd. 440, 447 ; *Lilley* v. *Fifty Associates,* 101 Mass. 432, 435 ; *Potter* v. *Tuttle,* 22 Connecticut, 512, 519. See, also, *Ahl* v. *Johnson,* 20 How. 511, 518.

To this class belongs, in our judgment, the case before us. Although the contract between Cheney and Libby called for

payment in dollars, the latter might well have supposed, unless distinctly informed to the contrary, that the former would be willing to receive current funds, that is, such as are ordinarily received by men of business or by banks. And such funds were received in payment of all of Libby's notes falling due in 1880 to 1884, inclusive. While this course of business was not an absolute waiver by Cheney of his right to demand coin or legal-tender paper in payment of notes subsequently falling due, such conduct, during a period of several years, was calculated to produce the impression upon Libby's mind that current or bankable funds would be received in payment of any of his notes. And, therefore, upon every principle of fair dealing Cheney was bound to give reasonable notice of his purpose, after 1884, to accept only such funds as, under the contract, strictly interpreted, he was entitled to demand. No such notice was given. On the contrary, the just inference from the testimony is, that Cheney designed to throw Libby off his guard, and render it impossible for the latter, or for the bankers to whom he sent drafts to be used in paying his notes, to supply the requisite amount of coin or legal-tender paper, on the very day the notes matured, and at the moment of their presentation for payment. The efforts of Russell & Holmes, within a few moments after Cheney left their bank on the 1st of June, to find him, and to pay off the notes in legal-tender paper, and the efforts of Libby, by his agent, as soon as he was informed of Cheney's demand for payment in coin or legal-tender paper, to reach him, and to pay off the notes maturing in 1885, in lawful money, and his repeated offers, subsequently, to pay them in such money, showed the utmost diligence, and sufficiently excuse his failure to pay in coin or legal-tender paper on the very day his notes matured. To permit Cheney, under the circumstances disclosed, to enforce a forfeiture of the contract, would enable him to take advantage of his own wrong, and to reap the fruits of a scheme formed for the very purpose of bringing about the non-performance of the contract.

But it is contended that the provision in the contract forbidding its modification or change, " except by entry thereon

in writing signed by both parties," coupled with the provision that no court should relieve Libby from a failure to comply strictly and literally with the contract, stands in the way of a decree for specific performance. It is sufficient, upon this point, to say, that such provisions — if they could in any case fetter the power of the court to do justice according to the settled principles of law — cannot be applied where the efficient cause of the failure of the party seeking specific performance to comply strictly and literally with the contract was the conduct of the other party. If the defendant had agreed, in writing, signed by himself alone, to accept current funds and not to demand coin or legal-tender notes, and, notwithstanding such agreement, he had demanded coin or legal-tender notes, under circumstances rendering it impossible for the plaintiff to meet the demand on the day limited by the contract, would he be permitted to say that the contract was forfeited for the failure to make payment according to its provisions? We suppose not, although, according to his argument, such an agreement not having been signed by both parties and endorsed on the contract, would not estop him from insisting upon a strict and literal compliance with its terms.

It results from what has been said that the failure of the plaintiff, Libby, in person or by agent, to pay the notes maturing in 1885, in coin or legal-tender paper, at the time they were presented by Cheney for payment at the banking-house of Russell & Holmes, did not work a forfeiture of the contract, and does not stand in the way of a decree for specific performance.

In respect to the notes falling due in 1886 and 1887, the evidence satisfactorily shows that the plaintiff, at the times and place appointed for their payment, offered, and was then and there ready, to pay them in lawful money, but the notes not being on either occasion in the hands of Russell & Holmes for collection, he could not make actual payment, but left the money at their bank to be paid over to Cheney whenever the notes were presented at that place. The notes due in those years were, it is true, in the manual possession of Russell & Holmes, but they were not in their custody by direction of

Cheney for collection or for any other purpose. Libby did all that he could do with respect to the notes falling due in those years in order to comply "strictly and literally" with the contract. Indeed, after the surrender by Cheney in 1885, of the notes due in that and subsequent years, and his formal notification to Libby that he regarded the contract as forfeited, and would not receive any money from him, Libby was not bound, as a condition of his right to claim specific performance, to go through the useless ceremony of tendering payment at the banking-house of Russell & Holmes of the notes maturing in 1886 and 1887. *Brock* v. *Hidy*, 13 Ohio St. 306; *Deichmann* v. *Deichmann*, 49 Missouri, 107, 109; *Crary* v. *Smith*, 2 Comstock (2 N. Y.) 60. In *Hunter* v. *Daniel*, 4 Hare, 420, 433, it was said: "The only remaining point insisted upon was that the making of every payment was a condition precedent to the right of the plaintiff to call for the execution of the agreement, or, in fact, to call for the benefit of it; and it was argued that the bill could not properly be filed before the plaintiff had, out of court, fully performed his agreement. The general rule in equity certainly is not of that strict character. A party filing a bill submits to do everything that is required of him; and the practice of the court is not to require the party to make a formal tender where, as in this case, from the facts stated in the bill, or from the evidence, it appears that the tender would have been a mere form, and that the party to whom it was made would have refused to accept the money." Whether that be a sound view or not, with reference to the particular contract here in question, Libby did, in fact, make a proper tender of payment as to these notes. Before the bringing of this suit he had paid, and offered to pay, more than one-half of the price for the land and all accrued interest and taxes, and, therefore, was entitled by the terms of the contract to a deed, he executing notes and a mortgage for the remaining payments to run the unexpired time, as stipulated in the agreement.

The court below found that the notes falling due in 1885, 1886 and 1887 were paid; that the plaintiff had deposited

with the clerk for the defendant a mortgage on the land to secure the payments due eight, nine and ten years after the date of the contract; and that he had fully done and performed every obligation imposed upon him to entitle him to a deed. It was adjudged that the defendant, within forty days from the decree, execute, acknowledge and deliver to the plaintiff a good and sufficient deed, with the usual covenants of warranty, (excepting the right of way that may be demanded for public use for railways or common roads,) conveying to him the land in question, and in default of which it was adjudged that the decree itself should operate, and have the same force and effect, as a deed of the above description.

We are not able to concur in the finding that the notes falling due in 1885, 1886 and 1887 had been *paid* when this decree was passed. If those notes had been placed by Cheney with Russell & Holmes for collection, and the latter had collected the amounts due on them, then they would have been paid; for in such case, that firm would have been the agent of the payee to collect the notes, and the money received by them would have belonged to him.

In *Ward* v. *Smith*, 7 Wall. 447, 450, the question arose as to whether a bank at which certain bonds were made payable was the agent of the holder to receive payment. The court said: "It is undoubtedly true that the designation of the place of payment in the bonds imported a stipulation that their holder should have them at the bank, when due, to receive payment, and that the obligors would produce there the funds to pay them. It was inserted for the mutual convenience of the parties. And it is the general usage in such cases for the holder of the instrument to lodge it with the bank for collection, and the party bound for its payment can call there and take it up. If the instrument be not there lodged, and the obligor is there at its maturity with the necessary funds to pay it, he so far satisfies the contract that he cannot be made responsible for any future damages, either as costs of suit or interest, for delay. When the instrument is lodged with the bank for collection, the bank becomes the agent of the payee or obligee to receive payment. The

agency extends no further, and without special authority an agent can only receive payment of the debt due his principal in the legal currency of the country, or in bills which pass as money at their par value by the common consent of the community. In the case at bar only one bond was deposited with the Farmers' Bank. That institution, therefore, was only agent of the payee for its collection. It had no authority to receive payment of the other bonds for him or on his account. Whatever it may have received from the obligors to be applied on the other bonds, it received as their agent, not as the agent of the obligee. If the notes have depreciated since in its possession, the loss must be adjusted between the bank and the depositors; it cannot fall upon the holder of the bonds." See, also, *Adams* v. *Hackensack Improvement Com.;* 44 N. J. Law (15 Vroom), 638, where this question is elaborately examined; *Hills* v. *Place,* 48 N. Y. 520; *Williamsport Gas Co.* v. *Pinkerton,* 95 Penn. St. 62, 64; *Wood* v. *Merchants' Saving, Loan & Trust Co.,* 41 Illinois, 267.

Russell & Holmes, then, did not become the agent of Cheney to receive the amount of the notes by reason simply of the fact that the notes were made payable at their bank. The funds left by Libby with them to be applied in payment of the notes of 1885, 1886 and 1887 are, therefore, his property, not the property of Cheney. The utmost effect of Libby's offer, within a reasonable time after June 1, 1885, to pay the note of that year in lawful money, and of his offers, at the appointed times and place, to pay the notes of 1886 and 1887, was to prevent the forfeiture of the contract, and to save his right to have it specifically performed, so far as that right depended upon his paying those notes. But they must be actually paid by him before he is entitled to a deed, or to a decree that will have the force and effect of a conveyance. Under the circumstances it was not absolutely necessary that he should have brought the money into court for the defendant at the time he filed his bill. His offer in the bill to perform all the conditions and stipulations of the contract was sufficient to give him a standing in court. *Irvin* v. *Gregory,* 13 Gray, 215, 218; *Hunter* v. *Bales,* 24 Indiana, 299, 303; *Fall*

,v. *Hazelrigg*, 45 Indiana, 576, 579. But the decree of specific performance ought not to become operative until he brings into court for the defendant the full amount necessary to pay off the notes for principal and interest falling due in 1885, 1886 and 1887. *Caldwell* v. *Cassidy*, 8 Cowen, 271; *Haxtun* v. *Bishop*, 3 Wend. 15, 21; *Hills* v. *Place*, *supra ; Wood* v. *Merchants' Saving Co.*, *supra ; Webster* v. *French*, 11 Illinois, 254, 278 ; *Carley* v. *Vance*, 17 Mass. 389, 391; *Doyle* v. *Teas*, 4 Scammon, 202, 261, 267; *McDaneld* v. *Kimbrell*, 3 Greene (Iowa), 335. The defendant is not entitled to interest after the respective tenders were made because it does not appear that the plaintiff has, since the tenders, realized any interest upon the moneys left by him for Cheney at the bank of Russell & Holmes. *Davis* v. *Parker*, 14 Allen, 94, 104; *January* v. *Martin*, 1 Bibb, 586, 590; *Hart* v. *Brand*, 1 A. K. Marsh. 159, 161: 2 Sugden on Vendors, 8th Amer. Ed. 314–15 [627–8].

*The decree below is affirmed. But it is adjudged and ordered that the said decree be and is hereby suspended, and shall not become operative until the plaintiff brings into the court below for the defendant the full amount of the notes for principal and interest executed by him to the defendant and made payable on the 28th days of May, 1885, 1886 and 1887, without interest upon any note after its maturity.*