## ATLANTIC STEEL CO. v. R. O. CAMPBELL COAL CO.

(District Court, N. D. Georgia. December 4, 1919.)

### No. 393.

1. SALES ⬷85(2), 411—PROVISION OF CONTRACT CREATING CONDITIONS SUBSEQUENT.

A provision of a contract for sale and purchase of coal, with equal monthly deliveries, that if the mines were unable to operate, or their output was curtailed, by causes beyond seller's control, it should not be liable for resulting failure to deliver, *held* to create conditions subsequent, which, under Civ. Code Ga. 1910, §§ 4223, 4224, were matters of defense, to be set up by defendant, rather than anticipated by plaintiff's pleading, in an action by the purchaser for failure of deliveries.

2. SALES ⬷62, 172—CONTRACT FOR SALE OF COAL A SEVERABLE, AND NOT ENTIRE, CONTRACT.

A contract for sale and purchase of 12,000 tons of coal per year for three years, 1,000 tons to be delivered each month and paid for the succeeding month, and further providing that, if the mines were unable to operate, or their output was curtailed, from causes beyond seller's control, it should not be liable for failure to make shipments "during such periods," *held* severable as to each month's deliveries; and under Civ. Code Ga. 1910, § 4228, inability of seller to make deliveries during the time its mines were in control of the federal Fuel Administration *held* to discharge it from its obligation to make such deliveries, but not from its obligation

⬷For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

to continue monthly deliveries after such control ceased, to the end of the contract term.

**3. SALES ☞71(1)—CONSTRUCTION OF CONTRACT FOR SALE OF COAL AS REQUIRING INCREASED SHIPMENTS.**

A contract for sale of coal, to be delivered in equal monthly installments, which recited that purchaser had another contract for its requirements of coal above the quantity covered by the present contract, and providing that seller should increase or decrease its shipment on request to conform to the proportionate increase or decrease of shipments by the other contractor, construed, and *held* not to require seller to increase shipments because of decreased shipments by the other contractor, but to mean that, should purchaser's requirements prove greater or less than estimated, shipments by both contractors should be increased or decreased proportionately.

At Law. Action by the Atlantic Steel Company against the R. O. Campbell Coal Company. On demurrers to petition and amended petition. Sustained in part.

Chas. T. & L. C. Hopkins, of Atlanta, Ga., for plaintiff.
Robert C. & Phil. H. Alston, of Atlanta, Ga., for defendant.

SIBLEY, District Judge. This is a suit for damages for the breach of a contract dated June 1, 1916, the material portion of which follows:

"In consideration of the price hereinafter agreed upon, subject to the terms and conditions hereof, the party of the first part agrees to sell, and the party of the second part agrees to buy, f. o. b. mines, 12,000 tons per annum of coal, for gas and reheating purposes, shipments to be made at the rate of 1,000 tons per month, or one car per day. The coal is to be what is known as the party of the first part's 'Westburn Gas Coal,' and mined at Westburn, Kentucky. * * * The price for the same shall be $1.35 per ton. * * *

"If the mines from which this coal is to be shipped are unable to operate by reason of mining troubles, or on account of other causes beyond their immediate control, the first party shall not be liable for failure to make shipments during such period; and if for the same reason the output of such mines is curtailed, shipments may be distributed pro rata on their existing orders and contracts during such periods.

"If the party of the second part is unable to operate its plant by reason of strikes or other causes beyond its immediate control, it shall not be liable for failure to receive shipments during such period; and if for the same reason the operation of the plant of the party of the second part is curtailed, it shall receive only such shipments as are necessary for its operation.

"Mine weights shall govern all settlements, and payments for all coal shipped shall be made by the fifteenth (15th) of the month immediately following the month of shipment, and all past-due accounts shall bear interest from maturity until paid.

"The party of the second part has a contract with Southern Coal & Coke Company for its requirements of coal, of approximately 50,000 tons per annum, in excess of the 12,000 tons per annum purchased from the said party of the first part, and the said party of the first part hereby agrees to increase or decrease its shipments of coal to conform to the proportionate increase or decrease in shipments to be made by the Southern Coal & Coke Company, upon request of the party of the second part, said increase, however, not to be in excess of twenty (20%) per cent."

Pertinent to the last paragraph, this letter is exhibited:

"January 31, 1917.

"The R. O. Campbell Coal Company, Atlanta, Georgia—Gentlemen: With reference to our contract with you of June 1, 1916, covering the delivery of

coal to us, beg to say that under this contract we were entitled to the fixed delivery of 1,000 tons of coal per month.  *  *  *

"Under the contract, we are entitled to increase the 1,000 tons per month to the extent of 20 per cent., and our business is in such condition as that it will be necessary for us to obtain the benefit of this increase; and you will please consider this communication as being a formal demand, under the contract and covering the future, not only for the delivery of 1,000 tons per month, but the additional 20 per cent."

Generally stated, the petition avers a partial failure to deliver the coal contracted for each month from June 1, 1916, to August, 1917, a total failure from August, 1917, to December 15, 1918, and a partial failure from that date to the termination of the contract; that each month plaintiff purchased the deficit in the open market at stated losses, for which, excluding the period from August 1, 1917, to December 15, 1918, damages in the aggregate sum of $23,698.93 are sought. During the last-named period the original petition states:

"The federal Fuel Administration took possession of the coal mines and their output.  *  *  *  Petitioner was forced to purchase its entire supply of coal necessary to the operation of its plant from companies other than the defendant. It received no shipments from the defendant company between the two dates mentioned. This suit does not include any failure upon defendant's part to deliver the stipulated coal during this period."

By amendment it is alleged:

"During the time the federal Fuel Administration controlled the output of said mines, the defendant received from the government $3.10 per ton for the coal which the defendant had contracted to sell plaintiff at $1.35 per ton, and which represented a legal obligation on the part of defendant to deliver said coal to the plaintiff at the prior price stipulated for in the contract.  *  *  *  The profit represented by the difference between the price which plaintiff was to pay, of $1.35 per ton, and the price received by the defendant, $3.10 per ton, was a profit received by the defendant for and in behalf of the plaintiff, and represents a sum which belongs to, and is the property of, the plaintiff, and for which it is entitled to recover in this cause" an aggregate sum of $21,768.

With reference to the subject-matter of the letter quoted above, the amendment further alleges:

"At the time that Exhibit B to the original petition was written, and subsequently thereto, and during the continuance of the contract between the plaintiff and the Southern Coal & Coke Company, the latter company delivered less than 75 per cent. of the contractual 50,000 tons per annum. This failure to deliver upon the part of the Southern Coal & Coke Company gave plaintiff the right to exercise its option under its contract with the defendant, and increase the shipments from 1,000 tons per month to 1,200 tons per month."

Damages are claimed for the failure to deliver the increase. The amendment also alleges that the shipments from December 15, 1918, to June 1, 1919, were made under the terms of the written contract, covered by its provisions, accepted by the plaintiff as a partial compliance, and paid for by the plaintiff under the contract.

Demurrers to the petition and amendment raise questions which will now be disposed of.

[1] First. The defendant contends that its obligation to deliver was conditional, and that the petition is deficient in not alleging that the conditions named in the contract occurred; that is, that defendant operated its mine and that its production was not curtailed, or, if curtailed, that the plaintiff did not receive its pro rata of coal shipped. The contract was made and to be performed in Georgia, and is governed by Georgia law. The liability to deliver is doubtless conditional, and if the conditions are precedent their occurrence must be averred and proved by the plaintiff, in order to show a right to recover. If subsequent, their occurrence is a matter of defense, to be set up by the defendant. Code Georgia 1910, §§ 4223, 4224. Section 3717, dealing with similar conditions, declares:

"The law inclines to construe conditions to be subsequent rather than precedent; and to be remediable by damages rather than by forfeiture."

It is plain that the purpose of these parties was to make a present contract for the delivery of 12,000 tons of coal per year, at the rate of 1,000 tons per month, for three years. The liability to deliver was not to arise on the occurrence of some event, but existed and was to continue unless and until certain possible things should happen. If these things did occur, they were conditions subsequent, and are to be set up by the defendant. This is true, except as to the condition relating to the right to demand an increase above 1,000 tons per month. The increase was to be demandable only upon the occurrence of the matters stated in the last paragraph of the contract. This condition was precedent, and it devolves upon the plaintiff to sufficiently aver the occurrence of the condition.

[2] Second. The petition and amendment affirmatively disclose that during the period from August, 1917, to December 15, 1918, the mine, or the output thereof, from which alone the contract coal was to be shipped, was taken over and controlled by the federal Fuel Administration. The plaintiff contends that this contract was entire, for 36,000 tons of coal, to be delivered in three years, and that if the delivery was interrupted in any manner it did not operate to defeat their right finally to have the coal contracted for, or damages for its nondelivery. The defendant contends that the contract was divisible, and that each month's shipment and payment therefor was independent of the other months, and that the effect of the legislation of Congress and the action of the President thereunder, and of the federal Fuel Administration, with regard to this mine, prevented delivery during the existence of the federal control, and excused delivery, not only for that period, but for the remainder of the contract. Code Georgia 1910, § 4228, declares:

"A contract may be either entire or severable. In the former, the whole contract stands or falls together. In the latter, the failure of a distinct part does not void the remainder. The character of the contract in such case is determined by the intention of the parties."

And see 9 Cyc. 648.

That the consideration is severable, as well as the articles to be delivered, is a strong circumstance to support the severable character

of the promise. This contract was intended by the parties to be severable as to each month's deliveries. The plaintiff so declares in the letter of January 31, 1917. Each month's delivery was to be paid for after the end of the month, and the plaintiff, in dealing with the matter, acted each month in buying in coal to supply the deficiency and in charging the loss to the defendant. The condition as to the discharge of either party on the nonoperation of its mine or plant, or for other cause beyond its control, provided, not that delivery or acceptance should be delayed, but that the failure should be excused. They evidently intended that there should be no accumulation of obligation from month to month, but that each month's business should stand for itself. Moreover, time, as is usual in mercantile contracts, was for the same reason evidently of the essence of this contract. Neither party desired its business to become involved and embarrassed by a postponement of the obligations assumed under this agreement. Waterman v. Banks, 144 U. S. 394, 12 Sup. Ct. 646, 36 L. Ed. 479; Cheney v. Libby, 134 U. S. 68, 10 Sup. Ct. 498, 33 L. Ed. 818; Bearden Mercantile Co. v. Madison Oil Co., 128 Ga. 695, 58 S. E. 200.

The act of Congress of August 10, 1917 (40 Stat. 279, c. 53 [Comp. St. 1918, §§ 3115⅛e to 3115⅛r]), provided in section 12 (Comp. St. 1918, § 3115⅛jj) that the President might take over for use and operation by the government, any mine and operate the same, returning it to the owners when he should determine it no longer essential for the national security, and paying a reasonable compensation for the use thereof, with power to regulate the operation, the disposition of the products, and the employment and compensation of employés. In section 25 (Comp. St. 1918, § 3115⅛q) a similar power was given the President to fix the price of coal and to require the producers of coal, or those in any special area, to sell their product only to the United States through an agency to be designated by the President, which might regulate the resale of such coal, the methods of production, shipment, distribution, and apportionment thereof; the act making it unlawful for the producer thereafter to make shipments of his product on his own account, and requiring shipment to be made only on the authority of the agency designated by the President, the price to be fixed by the Federal Trade Commission.

Under the allegations of the petition and amendment it is uncertain whether the defendant's mine was operated by the government, or its output simply taken over and controlled by it; but in either event the regulation of production and distribution was wholly in the hands of the government agency, and in neither case could the defendant lawfully make shipments upon its own orders taken prior to such control. Was the effect of this action of the government simply to postpone performance of the contract, or to discharge the contractor in part or in whole? It is true that impossibility of performance arising after the making of the contract, which might have been foreseen and guarded against by a stipulation of the contract, is ordinarily no defense to an absolute obligation. Jacksonville Railway v. Hooper, 160 U. S. 515, 16 Sup. Ct. 379, 40 L. Ed. 515; Chicago, Milwaukee & St. Paul

Ry. v. Hoyt, 149 U. S. 1, 13 Sup. Ct. 779, 37 L. Ed. 625. The rule is thus stated by Mr. Justice Swayne, in Dermott v. Jones, 2 Wall. at page 7, 17 L. Ed. 762:

"It is a well-settled rule of law that, if a party by his contract charge himself with an obligation possible to be performed, he must make it good, unless its performance is rendered impossible by the act of God, the law, or the other party. Unforeseen difficulties, however great, will not excuse him."

In this case, however, it was the law that subsequently rendered performance impossible.

"To the general rule that a party to a contract is not discharged by subsequent impossibility of performance, there is an exception where the performance becomes impossible by law, either by reason of, first, a change in the law; or, second, of some action by or under the authority of the government. In such case, the promisor is discharged. * * * In like manner, any prohibitory action taken by the public authorities will discharge the promise." 9 Cyc. 630.

That the defendant in this case, when called upon to surrender the use and control of its property to the public need, should thereby become liable to damages for failure to perform a civil obligation, is unthinkable. That its performance should be only temporarily excused would be less harsh, and, if time were not of the essence of the contract, it might be thought that no hardship would result in a mere postponement. To apply the rule of postponement, however, to the many contracts that were indefinitely arrested by government action, both in coal mines and manufacturing establishments, during the war, would perhaps result in an accumulation of obligations to make deliveries or to receive and pay for goods that would be ruinous to the persons involved. It would seem to be a much more practical rule to establish that, when the performance became due, whether time was strictly of the essence or not, if performance could not be made because of government action then forbidding, the duration of which obstacle was indefinite and unascertainable, the obligation was thereby canceled and the contract discharged, and that the parties should each be at liberty and under the duty to save themselves as best they might by other contracts and arrangements. This, in principle, seems to be settled by the rulings as to embargoes on ships releasing their owners from their contracts to carry, in the cases of Allanwilde Transport Corporation v. Vacuum Oil Co., 248 U. S. 377, 39 Sup. Ct. 147, 63 L. Ed. 312, and Standard Varnish Works v. Steamship Bris, 248 U. S. 392, 39 Sup. Ct. 150, 63 L. Ed. 321. And see L. & N. R. R. Co. v. Mottley, 219 U. S. 467, 31 Sup. Ct. 265, 55 L. Ed. 297, 34 L. R. A. (N. S.) 671.

The same conclusion may fairly be reached by a consideration of the contract that these parties actually made. While the occurrence of the exact conditions that did arise was, of course, not anticipated by them, still the contract provided:

"If the mines from which this coal is to be shipped are unable to operate by reason of mining troubles, or on account of other causes beyond their immediate control, the first party is not to be liable for failure to make shipments during said period."

While in a certain sense the mines did operate, they did not operate under the control of the defendant, nor was it able to avail itself of their operation in the discharge of its contracts. It may fairly be said that within the meaning of these parties, on account of causes beyond defendant's control, it could not operate its mine for the purpose of meeting the shipments due during the period of federal control, and that the stipulation that it should not be liable for the failure to make shipments is to be applied. In either view the defendant ought not to be liable for defaults during such period.

The theory of the amendment, however, is not to sue for failure to deliver under the ordinary rule of damages, but to assert a quasi equitable right to sue as for money had and received, or for an accounting for profits actually made by the defendant on account of deliveries to the government of this coal, instead of delivering it to the plaintiff. At first thought there seems to be, waiving any question of the appropriateness of joining such an action in the present suit, considerable justice in the idea; but it could not be practically applied and followed to its consequences. The plaintiff by this contract got title to no specific property, so as to own its proceeds. It got only an executory promise that so much coal should be produced and delivered to it, for which it gave only its executory promise to pay. Since the regulation of the production of the coal fell under the government agency, including the right to fix wages and hours of labor, the coal was produced under very different conditions from those that would have existed aside from government control, and it is not certain but that coal which might have been produced prior to such control at a profit at $1.35 per ton may actually have been produced at no greater profit at $3.10 per ton under such control. The effort to do justice by causing an accounting to be made of the actual profits received would have to go deeper than the mere comparison of the contract price with the price paid by the government.

Nor would it be good policy to hamper, during a time of war, response to the demands of the government on these mines with a liability over to others under pre-existent contracts. A similar scrutiny would have to be applied to the plaintiff, also, whose plant, the petition discloses, was a steel plant, which continued in operation during the war, doubtless under the same governmental control. Its products were sold, no doubt, at a price fixed by the government under the same law, based upon a profit with coal at $3.10 per ton, which it alleges it had to purchase during this period. Having been allowed, in this way, an expense item of $3.10 for coal, it ought not to be allowed to make an additional profit of the difference between that price and its old contract price. It will be readily seen that to follow an adjustment of the sort suggested in the amendment throughout the devious course that it might take in passing on a profit or loss under war conditions, to others affected by it, would be a wholly impractical job for the courts. The simplest and best rule, and the one most consonant with good policy, is that suggested first above, that the action of the government, in so far as it directly interfered with and prevented

the fulfillment of contracts, should be considered as a final discharge from their obligation.

Third. The defendant, however, contends that the effect of the government control was to annul the contract entirely, and to render it inoperative for the period succeeding government control until its expiration. This effect was attributed to it by neither party, for, under the averments in the petition, the defendant thereafter delivered coal in pursuance of the contract, which the plaintiff received and paid for at the contract price. The contract says:

"The first party is not to be liable for failure to make shipments during such period."

That both regarded the contract as of force afterwards is evident, nor does any good reason occur why it should not be treated as of force. It may be that costs of production had increased, and that the delivery was at a loss to the defendant; but it might equally have happened that the reverse should have occurred. The compulsion which prevented delivery during government control thereafter ceased to exist, and nothing having intervened to render the contract in its remaining provisions illegal, or even impossible of performance, there can be no good reason why each party should not be held to perform thereunder. No question has arisen as to time necessary after cessation of government control to prepare to resume deliveries. For such failures in these latter months as may be proved against the defendant it should be held liable in damages.

[3] Fourth. There remains to consider whether the plaintiff is justified in its claim to increased damages by reason of the failure of the defendant to increase its deliveries to 1,200 tons per month after the request of January 31, 1917. The petition fails to show a liability in this regard. A close reading of the language of the agreement discloses that the contract with Southern Coal & Coke Company was for plaintiff's requirements of coal, estimated at 50,000 tons per annum, in excess of 12,000 tons purchased of defendant, and that what the parties intended was that, if plaintiff's requirements proved more or less than 62,000 tons per year, so that Southern Coal & Coke Company had to increase or decrease its shipments, defendant might be called on to share with Southern Coal & Coke Company such increase or decrease in the ratio of 12,000 to 50,000; the increase, however, not to exceed 20 per cent. This construction gives literal effect to the words used, is intelligible and reasonable, but under it no liability appears in the pleadings, because the Southern Coal & Coke Company did not increase, but decreased, its shipments.

Plaintiff, however, contends the agreement means the reverse; that if the Southern Coal & Coke Company decreased its shipments below 50,000 tons per annum, the defendant was bound to increase its shipments to make good the deficiency. That the Southern Coal & Coke Company should at any time and for any period, for any reason, or for no reason, by simply refusing to deliver coal, impose on the defendant the duty of delivering it, no matter what the market price, could hardly have been intended by intelligent business men. More-

over, what would the word "proportionate" then mean? While increase or decrease may be proportioned to each other, it is difficult to understand how an increase can be proportioned to a decrease, and if the contract means what the plaintiff contends, could plaintiff on January 31, 1917, "covering the future," demand an increase of 20 per cent. of defendant before the default of Southern Coal & Coke Company occurred?

Yet, further, the request made upon defendant by plaintiff would not seem to be a reasonable compliance with the contract stipulation, for it utterly fails to indicate to the defendant that the circumstances had arisen on which the request would be justified. The ground of the request stated is simply:

"Our business is in such condition as that it will be necessary for us to obtain the benefit of this increase."

A request based merely upon this ground might justly be disregarded by the defendant. A case for recovery upon this item is not shown.

Fifth. Special demurrers complain that certain paragraphs of the petition aver mere conclusions of the pleader, or irrelevant facts. Some of the paragraphs do appear liable to this criticism in part; but the conclusions are harmless, and the irrelevant facts blended with other facts, that either aid in the construction of the contract or go to show the breach thereof. No sufficient reason appears for striking entirely any paragraph of the petition demurred to for this cause.

Let judgments upon the demurrers be taken accordingly.