## R. J. SHELTON v. TUTTLE MOTOR COMPANY.

(Filed 28 April, 1943.)

**Contracts §§ 11d, 12—**

   Where plaintiff "traded" defendant an old automobile in October, 1941, taking in part a due bill for $175 as a credit on a new car when he should want it, defendant advising plaintiff that after 1 January, 1942, he probably would not be able to deliver a new car, whereupon the parties agreed that defendant should not be liable for any delay or failure to make delivery for any cause, such agreement is a valid contract and plaintiff cannot recover the face of the due bill, since Rationing Order No. 2-A, "freezing" the sale of new cars, and the matter remains *in statu quo* until sale and delivery of a new automobile can be consummated.

DEVIN, J., dissenting.

SCHENCK, J., concurs in dissent of DEVIN, J.

SEAWELL, J., dissenting.

APPEAL by defendants from *Gwyn, J.,* at October Term, 1942, of STOKES.

Civil action to recover $175.00, advanced credit on purchase of new automobile.

The court of first instance (justice of the peace) rendered judgment for the plaintiff. On appeal to the Superior Court, a jury trial was waived, the facts were agreed upon, and the matter was thereupon submitted to the court for determination of the rights of the parties.

In summary, the operative facts follow:

1. The plaintiff traded the defendant an old automobile and took as part payment due bill for $175.00 good for credit on purchase of a new car. It was not contemplated that the new automobile should be delivered prior to 1 January, 1942.

2. The defendant had a gross profit of $200.00 in the sale of such new automobile.

3. The defendant advised the plaintiff that after January he probably would not be able to get automobiles to deliver to him until after the duration. Following this conversation, the parties entered into a contract with these principal provisions:

"This is to certify that I have this day traded Tuttle Motor Company one 1937 Chevrolet Tudor Sedan . . ., leaving a balance of $175.00 on deposit on a new car to be delivered when I want it. Except it is agreed that you will not be held liable for any delay or failure through any cause whatsoever in making delivery. The car will be delivered at the price upon delivery date.

"I agree to pay the balance on the car and accept delivery . . . at dealer's place of business within forty-eight hours after I have been notified that it is ready. In case I fail to take delivery of car when notified, my deposit may be retained as liquidated damages. . . .

"This 25th day of October, 1941.

R. J. SHELTON, Purchaser.

"RALPH D. TUTTLE,
          Dealer's Signature."


4. Thereafter, new automobiles were "frozen" by virtue of "Rationing Order No. 2-A—New Passenger Automobile Regulations," as amended, which further provides that "If performance of any agreement of sale or purchase of a new automobile is forbidden . . . any person who has made any payment on account of the purchase of such new automobile shall upon demand be entitled to the return of the amount of any deposit or any other consideration paid," etc.

These orders were issued pursuant to Act of Congress known as the Priorities and Allocations Act (Pub. L. 89, 77th Congress, 1st Session, C. 157), later enlarged by the Second War Powers Act (Pub. L. 507, 77th Congress, 2nd Session, C. 199).

5. Prior to the order of "freezing," the defendant approached the plaintiff relative to delivering him an automobile as per their agree-

ment, and the defendant was at that time advised by the plaintiff that he was not ready for an automobile. The defendant was then ready, able and willing to make delivery.

6. The plaintiff made application to the Rationing Board for permit to obtain a new car, which application was denied. Had plaintiff obtained such permit, the defendant could have made delivery.

7. The defendant sold the old automobile which he received from the plaintiff, valuing it upon sale for the purpose of financing at $350.00.

The plaintiff grounds his action on the provisions of "Rationing Order No. 2-A—New Passenger Automobile Regulations," as above set out. Recovery is resisted on the terms appearing in the memorandum of agreement signed 25 October, 1941, and further that no authority exists for declaring rights and remedies in the rationing orders.

The court being of opinion that plaintiff was entitled to recover the face amount of the due bill (voluntarily reduced to $150.00) upon which the present action is based, entered judgment accordingly, from which the defendant appeals, assigning error.

*Woltz & Barber and Petree & Petree for plaintiff, appellee.*
*A. J. Ellington and Folger & Folger for defendants, appellants.*

STACY, C. J. The parties have contracted against the very contingency which has arisen here. Indeed, their agreement was made with a view to its probable happening.

On 25 October, 1941, the plaintiff "traded" the defendant an old automobile, "leaving a balance of $175.00 on deposit on a new car to be delivered when I want it." It was not then contemplated that the new automobile should be delivered prior to 1 January, 1942. However, after closing the transaction, "the defendant advised the plaintiff that after January he probably would not be able to get automobiles to deliver to him until after the duration." In the light of this conversation, the parties drew up and signed the memorandum of agreement set out in the record. In this the plaintiff agrees that the defendant "will not be held liable for any delay or failure through any cause whatsoever in making delivery. The car will be delivered at the price upon delivery date." And further, "In case I fail (for 48 hours) to take delivery of car when notified, my deposit may be retained as liquidated damages," etc.

In other words, anticipating that the purchase of new automobiles might thereafter be "frozen," the parties entered into an agreement, setting out that in such event the plaintiff's memo of credit with the defendant should likewise be "frozen." That is, the parties undertook in advance to say how the matter would be handled if the freezing of

new automobiles should occur. *Atlantic Steel Co. v. Campbell Coal Co.,* 262 Fed., 555. This is a lawful contract, and neither the Acts of Congress nor the Executive Orders relied upon by the plaintiff purport to declare it unlawful or inoperative. These Federal pronouncements were intended for other facts. They are not controlling on this record. The plaintiff was at liberty to cancel the credit memorandum, if he wanted to, or to do with it as he pleased. He enjoyed then, and still enjoys, freedom of contract in respect of such credit.

Prior to the time when "the freezing of new automobiles" went into effect, the defendant approached the plaintiff relative to making delivery of a new car as per their agreement—the defendant then being ready, able and willing to make delivery—but the plaintiff said he "was not ready for an automobile."

The plaintiff, therefore, finds himself face to face with two insurmountable provisions in his contract:

First, he has agreed that the defendant shall not be liable for any delay or failure through any cause whatsoever in making delivery of the new car. This defeats the present action.

Second, he has agreed that in case he fails to accept delivery within 48 hours after notice, his deposit may be retained as liquidated damages. While notice was given to the plaintiff prior to the "freezing" order, thereby possibly making available the terms of this provision, still the defendant has not sought to take advantage of it, because of the original understanding that delivery of the new automobile was not contemplated prior to January 1, 1942.

Notwithstanding these permissible defenses, the defendant has signified his willingness to make delivery, if and when the plaintiff wants a new car and is permitted to purchase one. The plaintiff made application for permit to obtain a new car, after rationing went into effect, but his application was denied.

Plaintiff sues to recover $175.00, "due on contract." On the hearing in the Superior Court he voluntarily reduced his claim to $150.00. Even the plaintiff will not say what his credit memorandum is worth in cash, for he realizes the defendant had a profit in excess of the memorandum in the sale of a new automobile, and he also remembers the stipulation against liability in case of "freezing." He did not think so much of his credit memorandum when he signed the agreement releasing the defendant from liability in case of "delay or failure" to make delivery of the new car.

The disposition of the old car by the defendant is not germane to the case. Title passed and the plaintiff has no further interest in this car. Viewed in the light most favorable to the plaintiff, the contract must at least be construed as an agreement to allow the plaintiff's credit with

the defendant to remain *in statu quo* until the purchase and sale of a new automobile can be consummated. Plaintiff would ignore this agreement. But it is signed by him; it is valid, and he is bound by its terms.

The trial court predicated its judgment on the supposed abrogation of the "due bill" given at the time of the trade, and "upon which the present action is based," according to a recital in the judgment. The case is controlled by the memorandum of agreement afterwards signed by the parties and in which the defendant is relieved of liability for any delay or failure through any cause whatsoever in making delivery of a new car. The defendant is entitled to prevail on the record as presented. Judgment accordingly.

Reversed.

DEVIN, J., dissenting: I am unable to agree with the result reached in this case. I do not think the defendant should be permitted to retain the plaintiff's money without consideration indefinitely, when by the rationing orders and regulations of the Federal Government, made pursuant to authority of the Acts of Congress in aid of the war effort of our country, the plaintiff has been prevented from buying and equally the defendant from selling the automobile about which the original contract was made. It seems to me the ends of justice would be met by adhering to the rule established in such cases by the Federal Regulations, and restoring the parties to their original position, without loss to either party.

SCHENCK, J., concurs in this opinion.

SEAWELL, J., dissenting: I find nothing in the stipulations and in the written contract between the parties to justify the Court in assuming that they had contracted with reference to any "freezing" order by the Government prohibiting the sale of automobiles. The defendants did not make that argument here, either in brief or in oral argument. They depended solely on the theory that the effect of the presidential orders was to temporarily suspend the contract while the restriction lasts, to be revived after it has been removed, citing cases relative to that theory. They did challenge the power of the Government to require, by executive orders, the return of the advance payment of the purchase price.

The authorities are overwhelmingly against the position of the defendants on the first proposition. Not only does the presidential order prohibit the transaction, but a violation of the regulation is a criminal offense, punishable under Title III of the Second War Powers Act by fines up to $10,000 and imprisonment for one year, or both. Violations of such regulations are also punishable under section 37 of the Criminal

Code, 18 U. S. C. A. Sec. 88; Act of 1917, Sec. 4, 50 U. S. C. A. Sec. 34, as conspiracies to commit an offense against the Government. Also the restriction is intended to preserve for military use materials of war which are now far more critical than they were when the original order was promulgated, and the restriction must, therefore, be assumed to be for the duration of the war, or at least for an indefinite extent, and the contract thereby discharged. *Metropolitan Water Bd. v. Dick, Kerr & Co., Ltd.* (1917), 2 K. B. 1; (1918) A. C. 119, 115 L. T. N. S., 448; *The Clavaresk* (1920), 264 Fed., 276; *Schmidt v. Wilson & Kanham,* 47 Ont. L. Rep., 194; *Allanwilde Transportation Corporation v. Vacuum Oil Co.,* 248 U. S., 377, 63 L. Ed., 312; *Standard Chemicals and Metals Corp. v. Waugh Chemical Corp.,* 185 N. Y. Sup., 207; *Jersey Ice Cream Co. v. Banner Cone Co.,* 204 Ala., 532, 86 So., 382; *Atlantic Steel v. R. O. Campbell Coal Co.,* 262 Fed., 555; Effect of War on Contracts, Webber (1940), p. 378; see Scrutton L. J. (1917), 2 K. B., 35, 36.

Since we are not dealing with a commercial transaction upon a suit begun after the restriction has been removed, and where it appears that the basis of the contract has survived and the performance may be still feasible, it is the duty of the Court to determine the matter now upon the facts as they now appear, taking into consideration events that have taken place since the transaction was forbidden and fulfillment became impossible. *Comptoir Commercial Anversois v. Power, Son & Co.* (1920), 1 K. B. (Eng.), 868, 36 Times L. R., 101; *Embricos v. Reid,* 3 K. B. (Eng.), 45, 111 L. T. N. S., 291.

Under the American rule, where the contract has thus become impossible of fulfillment, the advance consideration must be returned on demand, or an action may be maintained to recover it as an unjust enrichment as in *assumpsit.* Williston on Contracts, sections 1769, 1792; Restatement, Contracts, section 468 (1); Restatement, Restitution, sec. 66 (3). "One who has paid for goods he never gets is entitled to recover the payment, even though the reason why performance was not made by the seller is excusable impossibility." Williston, sec. 1794. "The Act of God may properly lift from his shoulders the burden of performance, but it has not yet extended so as to enable him to keep the other man's property for nothing." *Board of Education v. Townsend,* 63 Ohio St., 514, 59 N. E., 223; Restatement, Restitution, S. 25, comment b.

There is no sound reason why we should either ignore or evade the positive requirements of the Government order that the money be returned. This order, the plaintiff contends, entitles him to his money. The defendants deny the power of the Government to abrogate their contract or effectuate such an order. The purport and effect of the two orders taken together is to discharge the contract and require restitution. In my judgment they apply to the terms of this contract. Except for

this denial of Federal wartime power over civilian contracts relating to the use of vitally necessary materials of war, the controversy would be too trivial to justify extended notice.

It is the duty of the Court, of course, to declare the law under all circumstances and with cool detachment. Even if the people of the United States by some congenital ineptness in their legal institutions, or irreconcilable conflict in their fundamental laws, are deprived of the ability to act in national unity in a time of national peril, or as states, to agree upon things necessary to a successful prosecution of war, doubtless it would be our duty to say so. It is also our duty as a State Court to uphold those fundamental rights which the people have not surrendered to the care of Congress, either under the Federal or State Constitution. But it is not our duty to reassert rights which have been constitutionally subordinated to the Federal administration of the national defense, and in the face of powers which have been categorically delegated for that purpose. The incidence of wartime regulation is not upon the independence of the courts, but upon the conduct of persons. These come into the forum with civil rights abridged, contracts annulled, and causes of action profoundly affected by the emergency of war and the acts of the Federal Government necessary to its prosecution. In *Home Building & Loan Association v. Blaisdell,* 290 U. S., 398, 426, *Mr. Justice ·Hughes* · said:

"The constitutional question presented in the light of an emergency is whether the power possessed embraces the particular exercise of it in response to particular conditions. Thus, the war power of the Federal Government is not created by the emergency of war, but it is a power given to meet that emergency. It is a power to wage war successfully, and thus it permits the harnessing of the entire energies of the people in a supreme co-operative effort to preserve the nation. But even the war power does not remove constitutional limitations safeguarding essential liberties." *Horowitz v. U. S.,* 267 U. S., 458, 69 L. Ed., 736; *Norman v. B. & O. R. R. Co.,* 294 U. S., 240, 307, 308, 79 L. Ed., 885.

Speaking within the limits of the constitutional grant of power and to a subject which has proper relevancy to the conduct of war, the voice of Congress is *suprema lex.* It is only when some fundamental and inalienable right of the citizen, protected by our Constitutions, either Federal or State, and not surrendered to the care of Congress, becomes threatened that we come face to face with the necessity of "safeguarding essential liberties" to the full extent of our judicial power. There is no point in denying to the National or Federal Government, acting within its wartime powers, authority to take action relevant to the national defense when it affects only property rights which we ourselves have a hundred times, even in peace, declared to be, *sub modo,* relative and subordinate

SHELTON v. MOTOR CO.

to the general welfare; or in reaching that result by adopting a doctrine at variance with what the Government, in the exercise of a legitimate power, desires to do.

When the Constitution was adopted and our dual form of government was created, the difficulty of carrying on war by ordinary democratic processes, especially when these were parceled to the several states, was not unappreciated nor undebated. Implicit in the grant of power which we gave to the Federal Government for the national defense is that the power should be adequate to the purpose; and this implies and justifies its summary and administrational exercise in a manner which may suspend, in order that they may be eventually preserved, some of the rights which the states are commendably jealous in preserving in time of peace.

Whether with regard to strictly military operations or to civilian conduct when properly subject to wartime regulation, the principle is the same. The power given to the Government and the mode of its exercise must be adequate to the immediacy of situations which arise, both here and at more distant fronts, with a minimum of notice and a maximum of urgency. That power, we are convinced, cannot be successfully exercised when confined to mere negations, however heavy the barrage. And in some instances, at least, the power to restore must be a corollary to the power to destroy. The action of the Federal Government in arresting this contract cannot be considered an impersonal *force majeure,* unpurposively creating a situation which it is powerless to amend. There is a nexus of circumstance, including the reports of committees, debates in Congress, the background and wording of the Acts themselves, the orders which speak for themselves, that shows a full appreciation of the subjects we have been discussing, and the purpose not to leave the rights of parties who suffer infraction of their contracts left as dangling ends of discord and litigation.

Regulations and orders like these, intended to prevent loss through displacements caused by necessary Government action, or to restore economic balances, whether small or great, in the manner sought to be done in this instance, have a reasonable relation to the objectives of the War Powers Acts, and may be regarded as within their authority. Until held otherwise by competent Federal authority, full faith and credit should be given them in this Court.

In my opinion, the judgment of the court below should be affirmed.